## PIGEON RIVER IMPROVEMENT, SLIDE & BOOM CO. v. CHARLES W. COX, LTD.

No. 126.   Argued December 6, 7, 1933.—Decided January 15, 1934.

140

*Mr. John D. Jenswold,* with whom *Mr. Bernard R. Goggins* was on the brief, for appellant.

142

*Mr. Edward L. Boyle,* with whom *Messrs. H. B. Fry- berger* and *H. C. Fulton* were on the brief, for appellee.

144

146

Mr. Chief Justice Hughes delivered the opinion of the Court.

Pigeon River Improvement, Slide & Boom. Company, a Minnesota corporation, brought this action against Charles W. Cox, Limited, a Canadian corporation, to recover tolls for the use of improvements which the Minnesota corporation had made in the Pigeon River. These improvements embraced sluiceways, booms and dams, which were used by the defendant in driving, sluicing and floating timber products. The case was removed to the federal court, a demurrer to the amended complaint was sustained without leave further to amend, and the judgment of dismissal was affirmed by the Circuit Court of Appeals. 63 F. (2d) 567. The case comes here on appeal.

Pigeon River is a boundary stream between the State of Minnesota and the Province of Ontario, Dominion of Canada, at the northeast corner of Minnesota. The river is a small stream which has its source in lakes on the international boundary and flows in a southeasterly direction along that boundary for about forty miles, discharging at Pigeon Bay into Lake Superior. The boundary is approximately midstream. The defense against the charge of tolls is based upon Article II of the Treaty of

148

1842—the Webster-Ashburton Treaty—which, after defining the international boundary, provides as follows: [1]

"It being understod that all the water communications and all the usual portages along the line from Lake Superior to the Lake of the Woods, and also Grand Portage, from the shore of Lake Superior to the Pigeon River, as now actually used, shall be free and open to the use of the citizens and subjects of both countries."

When this treaty was concluded, the lower portion of the Pigeon River was impassable because of falls and rapids. On July 25, 1842, Mr. Ferguson, who had been surveyor to the commissioners under the seventh article of the Treaty of Ghent,[2] thus described this part of the river in response to an inquiry by Mr. Webster:[3] "At the mouth of the Pigeon River, there is probably about three hundred yards in length of alluvial formation; but the river above that, as far as to near Fort Charlotte, runs between steep cut rocks of basaltic or primitive formation, and is a succession of falls and rapids for nearly its whole length—the last cataract, which is within about a mile of its mouth, being almost one hundred feet in height." Below Fort Charlotte, on the Pigeon River, communication with Lake Superior was by means of a trail about nine miles long running south of the river, and some distance from it, which was known as the Grand Portage and was so described in the treaty.[4] In Mr. Webster's com-

---

[1] 8 Stat. 574; Malloy, Treaties, vol. 1, pp. 652, 653.

[2] 8 Stat. 221, 222; Malloy, Treaties, loc. cit., pp. 617, 624.

[3] Sen. Doc., vol. 1, No. 1, 27th Cong., 3d sess., pp. 104, 105. See also "The Topography and Geology of the Grand Portage," George M. Schwartz, Minnesota Historical Bulletin, vol. 9, p. 27.

[4] "The Pigeon River, which now forms the international boundary at Lake Superior, was, in the days of water transportation, the best natural highway between the Great Lakes or the St. Lawrence system, and the great northwestern section of the continent, with its thousands of lakes and streams draining into Hudson Bay or the Arctic

municatioñ to Lord Ashburton of July 27, 1842, summarizing the understanding which had been reached as to the boundary and setting forth the proposed stipulation as to water-communications and portages which was incorporated in the treaty as above quoted, he said: "The broken and difficult nature of the water communication from Lake Superior to the Lake of the Woods renders numerous portages necessary; and it is right that these water communications and these portages should make a common highway where necessary for the use of the subjects and citizens of both Governments."[5] At the time of the conclusion of the treaty, this was the highway of commerce, used principally by fur traders, between the Great Lakes and the country to the north and northwest.[6] But the Pigeon River itself, prior to the improvements here in question, as alleged in the complaint and admitted by the demurrer, "was at all times incapable of use for the driving, handling and floating of logs, pulp-wood and timber."

Ocean. But the Pigeon River, through the last twenty miles of its course before it flows into Lake Superior, is so obstructed by falls and by cascades in rocky canyons as to be impossible of navigation. On the Canadian side the land is too mountainoùs and the distance too great for portaging to be practicable; but on the American side the line of the lake shore is roughly parallel to the river, and about seven or eight miles from the mouth of the river a little bay forms a natural harbor from which a portage of about nine miles over not too difficult country can be made to the Pigeon River above the cascades." "The Story of the Grand Portage," Solon J. Buck, Minnesota History Bulletin, vol. 5, p. 14.

[5] Sen. Doc., vol. 1, No. 1, 27th Cong., 3rd sess., p. 61.

[6] For a description of the traffic carried on by means of the Grand Portage, see "The Story of the Grand Portage," Minnesota History Bulletin, vol. 5, pp. 15-26; "Voyages from Montreal through the Continent of North America," Sir Alexander Mackenzie, vol. 1, pp. lxxi, lxxvii-lxxxii; Henry-Thompson Journals, Elliott Coues, vol. 1, pp. 6, 7; Wisconsin Historical Collections, vol. xi, pp. 123-125, note.

Pigeon River Improvement, Slide & Boom Company, which for convenience we may call the Pigeon River Company, was incorporated in 1898 under the General Laws of Minnesota.[7] These laws purported to empower the Pigeon River Company to improve streams by erecting sluiceways, booms, dams and other works; to acquire structures already erected together with necessary rights of way, shore rights, land and lands under water; to operate its works so as to render the driving of logs practicable; and to collect "reasonable and uniform tolls upon all logs, lumber and timber driven, sluiced or floated " on the streams so improved. The Company was also authorized, in the case of a boundary stream, to purchase stock in a corporation created in an adjoining State or country for similar purposes upon the same stream, or to unite with such a corporation, upon conditions stated. Acting under this authority, the Pigeon River Company took possession of the portion of Pigeon River within the State of Minnesota and improved it by erecting sluiceways, booms and dams on the Minnesota side of the international boundary.

At the same time, the complaint alleges, the Arrow River & Tributaries, Boom & Slide Company, was organized under the laws of the Dominion of Canada and Province of Ontario, with powers and purposes similar to those of the Pigeon River Company, but limited to the portion of the Pigeon River and its tributaries within the Dominion of Canada. This Canadian corporation, under an agreement with the Pigeon River Company, similarly improved the portion of the Pigeon River on the Dominion side of the boundary, so that the improvements made by each company " constituted complements the one of the other, and the whole of said improvements

---

[7] General Laws of Minnesota, 1878, Chap. 34; 1889, Chap. 221; 1905, Chap. 89; Mason's Minnesota Statutes, 1927, §§ 7550–7552.

rendered the driving of logs thereon reasonably practicable and certain." These improvements, which have since been maintained, were all located below Fort Charlotte on the Pigeon River, with the sole exception of a reservoir dam at the south end of South Fowl Lake.

Adjacent to the lower part of the Pigeon River on the Minnesota side, lies the Grand Portage Indian Reservation, extending for a considerable distance along the stream.[8] By the Act of Congress of March 3, 1901,[9] the Pigeon River Company was authorized, under such regulations and conditions as the Secretary of the Interior might prescribe, to "improve the Pigeon River at what is known as the cascades of said river, for the purpose of making said river at said point navigable for floating logs." For that purpose the Company was empowered to enter upon unallotted lands and, with the consent of the allottees, upon allotted lands, adjacent to the cascades, of the Grand Portage Indian Reservation and to construct such dams, bulkheads and other works as should be necessary. It was further provided that the river "after being so improved shall be open at all times to the free passage of all timber cut from said Grand Portage Indian Reservation, and to the passage of all other timber for a reasonable charge therefor."[10] It does not appear that the Secretary of the Interior prescribed any regulations or conditions in relation to the improvements made by the Pigeon River Company.

Recovery is now sought for the use by the defendant, a Canadian corporation, of these improvements in the years 1928, 1929, and 1930, in driving, sluicing and floating upon the Pigeon River its pulp wood and railway ties.

[8] 10 Stat. 1110; see, also, H.R. 51st Cong., 1st sess., Ex. Doc. No. 247, p. 59.

[9] C. 878, 31 Stat. 1455.

[10] See Cong. Rec., 56th Cong., 2d sess., vol. 34, pt. 4, p. 3462.

This timber, the defendant says in its argument, was cut from Canadian lands and put into the Arrow River, a tributary in Canada of the Pigeon River, and was floated into the Pigeon River on its way to Lake Superior and Canadian mills. The tolls charged the defendant are alleged in the complaint, and thus admitted, to be the " reasonable and uniform tolls " which the Pigeon River Company had established. No question is raised as to reasonableness or discrimination, the only question being whether, in the light of the provision of the treaty, any tolls whatever could be charged. The contentions of the defendant are that the Pigeon River is a boundary stream and, as one of the " water communications " described in the treaty, must be kept " free and open " to the use of the citizens and subjects of both countries; that the imposition of tolls is inconsistent with this stipulated immunity and is not justified by the legislation which the Pigeon River Company invokes.

The Circuit Court of Appeals in the instant case followed its earlier decision in *Clark* v. *Pigeon River Improvement, Slide & Boom Co.*, 52 F. (2d) 550, where the court reached the conclusion that the charge of tolls was forbidden by the treaty. The court disagreed with the view advanced by the Pigeon River Company that the words of the treaty " as now actually used " limited the provision as to " free and open " use, expressing the opinion that these qualifying words referred only to the Grand Portage. *Id.*, pp. 555, 556. In support of its conclusion, the Circuit Court of Appeals cited the decision of the Appellate Division of the Supreme Court of Ontario in the case of *Arrow River & Tributaries, Slide & Boom Co.*, 66 Ont.L.R. 577; where the court held that the Canadian Company did not have " the right to build upon the bed of the Pigeon River anything which may interfere with the enjoyment of free and open use of it by the citizens of the United States." After the Circuit Court of Ap-

peals had decided the *Clark* case, the judgment in the case of the *Arrow River Company* was reversed by the Supreme Court of Canada. 1932 Canadian Supreme Court Reports, 495. The latter decision was brought to the attention of the Circuit Court of Appeals in the instant case, but the court adhered to its former opinion. 63 F. (2d) 568, 569.

The litigation in Canada presented the question whether the statutes of the Province of Ontario authorized the Canadian Company to construct and maintain works upon the Pigeon River on the Ontario side of the international boundary and to charge tolls upon timber passing through those works. It appeared that the Arrow River & Tributaries, Slide & Boom Company, Ltd., had been incorporated in 1922 under the Ontario Companies Act,[11] for the purpose of acquiring or constructing dams, booms and other works to facilitate the transmission of timber down the Arrow River, and its tributaries, and that part of the Pigeon River which is within the Province of Ontario; and that the Company had acquired title to, and had extended, works which had been erected by a former corporation formed in 1899 with the same shareholders and directors and with similar objects. The Company applied to the District Judge for approval of tolls to be charged for the use of these works, and the respondent in that case, the Pigeon River Timber Company, Ltd., sought an injunction restraining the District Judge from acting upon the application. The Webster-Ashburton Treaty was invoked and it was contended that the provision of the Ontario statute, so far as it purported to authorize the Company to charge tolls for the use of its improvements on that river, was "*ultra vires* of the Ontario Legislature." The District Judge

---

[11] R.S.O. 1914, c. 178; R.S.O. 1927, c. 218; Lakes and Rivers Improvement Act, R.S.O. 1927, c. 43; §§ 32, 52.

refused the injunction, for the reason that "treaties to which Great Britain is a party are not as such binding on the individual subject in the absence of legislation." On appeal, the Appellate Division of the Supreme Court of Ontario agreed with that principle but had a different opinion as to the effect of the legislation of Ontario. That Court decided that the statute in question applied to lakes and rivers that were wholly within the Province and did not apply to the Pigeon River which was a boundary stream. The reason given for this construction was that the court should not impute to the legislature an intent to authorize a violation of the terms of the treaty, if the statutory provision was capable of another construction. The Supreme Court of Canada reversed this decision of the Appellate Division of the Supreme Court of Ontario, holding that the statute did authorize the construction of the works on the Pigeon River and also the charge of tolls for the use of the improvements, and, as thus construed, was within the competency of the provincial legislature.

In the Supreme Court of Canada three opinions were delivered. Three of the five judges held that the legislation was not in conflict with the terms of the treaty. Of this majority, Judges Rinfret and Smith, in an opinion delivered by the latter, took the view that the right preserved by the provision of the treaty "was the right to continue to use the water communication and portages then in use." They expressly disagreed with the opinion of the Circuit Court of Appeals in the *Clark* case, *supra*, that the words "as now actually used" applied only to Grand Portage. These judges could not see any reason "for preserving a right to use Grand Portage that would not apply to other portages," and they thought that the language of the provision appeared "to apply to all, and to the water communications, and should be so construed." They added: "What was being dealt with, and

what was in the contemplation of the parties, was travel and transportation over the water communications and portages as then used, and there was . . . no thought or intention of dealing with the use of these non-navigable rapids and falls that were not in use and could not be used, the passing of which was provided for by the portages."

Chief Justice Anglin wrote a separate opinion agreeing in the result " largely for the reasons " stated by Judges Rinfret and Smith. He said, however, that he should have " preferred it had the majority of the court seen its way clear to base its decision upon a holding " that the stipulation of the treaty " was merely meant to ensure to the citizens of both countries equality of rights in regard to the water communications, portages, etc., and that it never was intended thereby to provide that in no event should either party to the treaty be at liberty, as regards citizens of its own nationality, to impose tolls for the use of improvements lawfully to be made thereon "; that " where either party to the treaty saw fit to impose tolls upon its own citizens, in regard to such improvements, it should be at liberty to impose like tolls (but none greater) on citizens of the other country for the use of the improvements so made."

Two judges—Judges Lamont and Cannon—delivered an opinion to the effect that " although at the date of the treaty the chief purpose for which these water communications were being used was the transportation by boat or canoe of persons and goods, the clause in question places no limit on the purposes for which they might be used "; that " they are to be ' free and open ' to the people of both countries for whatever purpose they may desire to use them as a water communication," and therefore if " they could be used for any purpose which did not necessitate the making of a portage to get past a point of danger," there was " nothing in the clause, or in any other

part of the treaty, which would compel the use of the portage in order to have a free passage." These judges thought that to hold otherwise would be "to give too narrow a construction to the language used, and to impute a want of vision to the framers of the treaty." They expressed the opinion that the Pigeon River "from its mouth along both sides of the boundary line, forms part of the 'water communications' which were to be free and open," and that this provision is not consistent with the imposition of tolls for the use of improvements erected in the river. While thus construing the treaty, Judges Lamont and Cannon nevertheless reached the final conclusion that the legislation authorizing the imposition of tolls was applicable and valid. This was in the view that "the legislative competence of a provincial legislature is as plenary and as ample as the Imperial Parliament in the plenitude of its power possessed, and could bestow"; that the existence of the treaty does not of itself impose a limitation upon the provincial legislative power; that "the treaty in itself is not equivalent to an Imperial Act and, without the sanction of Parliament, the Crown cannot alter the existing law by entering into a contract with a foreign power." Hence, it was said, the rights and privileges given by a treaty are, under Canadian law, enforceable by the courts only where the treaty "has been implemented or sanctioned by legislation rendering it binding upon the subject," and the statute giving authority to impose tolls for the use of the improvements "must be considered to be a valid enactment until the treaty is implemented by Imperial or Dominion legislation." While the judges of the Supreme Court of Canada thus differed in the grounds of their judgments, they agreed in the result.

Under this decision in Canada and that of the Circuit Court of Appeals, we have the extraordinary situation that as to these improvements at the same place on the

boundary stream—improvements necessarily comple-
mentary to each other—the Ontario Company may im-
pose charges upon citizens of the United States for the
use of its works on the Canadian side of the line while the
Minnesota Company may not charge citizens of Canada
for the use of its corresponding works on the Minnesota
side.

In deciding the instant case, we think that there are
controlling considerations which make it unnecessary to
pass broadly upon the significance of the words " free and
open " in provisions in treaties relating to the use of navi-
gable streams,—a phrase which with different contexts
has been repeatedly used in international engagements.[12]
The question here is simply as to the application of these
words of the Webster-Ashburton Treaty to this particular
boundary stream, the Pigeon River, at points where the
river was impassable and hence not used as a means of
communication at the time the treaty was made, the
travel and transportation of that period, and of earlier
times, necessarily seeking the portage by means of which
alone it was practicable to secure the desired communica-
tion. The words of the clause in question " as now actu-
ally used," undoubtedly refer to the Grand Portage, but
we think there is force in the reasoning of the opinion of
Judges Rinfret and Smith in the Supreme Court of Can-
ada that these words were not limited to that portage, and
we are not convinced that it was the intention either to

[12] See Treaty of September 3, 1783, between the United States and
Great Britain, Art. VIII, Malloy, p. 589; Webster-Ashburton Treaty,
1842, Art. III, Malloy, p. 653; Treaty of Washington, 1871, Arts.
XXVI, XXVIII, compare Art. XXVII, Malloy, p. 711; Convention
concerning the Boundary Waters between the United States and Can-
ada, 1909, Art. I, U.S. Treaties, vol. 3, p. 2608; Treaty of Guadalupe
Hidalgo, 1848, Arts. VI, VII, Gadsden Treaty, 1853, Art. IV, Malloy,
pp. 1111, 1123; Moore, International Law Digest, vol. 1, pp. 625,
et seq.; Hyde, International Law, vol. 1, §§ 160, et seq.; Oppenheim,
International Law, 4th ed., §§ 178, et seq.

preclude an improvement which would make a stream along the boundary available for use theretofore impossible, or to prevent a reasonable and non-discriminatory charge for the use of such an improvement. In the terms of the treaty we find no compelling clarity of prohibition. At best, the clause is ambiguous, and it is appropriate that we should look to the practical construction which has been placed upon it.

With respect to the portion of the stream within the territorial jurisdiction of the State of Minnesota, the legislature of that State authorized the erection of these improvements and the charging of reasonable tolls. In contemplation of improvements of this sort in a stream forming part of the international boundary, the state legislation expressly provided for the uniting of such an enterprise with a similar and complementary project appropriately authorized with respect to the Canadian portion of the stream. In the absence of a violation of treaty, or of conflict with an act of the Congress, there can be no doubt as to the power of the State to establish such an aid to commerce. An undertaking of this character by the State falls within the familiar category of cases in which a State may make reasonable provision for local improvements until its authority is superseded by dominant federal action.[13] The fact that the stream forms part of the international boundary does not make this principle inapplicable. Where, under § 9 of the

---

[13] *Willson* v. *Blackbird Creek Marsh Co.*, 2 Pet. 245; *Gilman* v. *Philadelphia*, 3 Wall. 713; *Pound* v. *Turck*, 95 U.S. 459; *Mobile County* v. *Kimball*, 102 U.S. 691; *Cardwell* v. *American Bridge Co.*, 113 U.S. 205; *Huse* v. *Glover*, 119 U.S. 543; *Sands* v. *Manistee River Improvement Co.*, 123 U.S. 288; *Lindsay & Phelps Co.* v. *Mullen*, 176 U.S. 126; *Minnesota Rate Cases*, 230 U.S. 352, 403–405; *International Bridge Co.* v. *New York*, 254 U.S. 126; *Economy Light & Power Co.* v. *United States*, 256 U.S. 113; *Newark* v. *Central R. Co.*, 267 U.S. 377.

Act of March 3, 1899,[14] the consent of Congress is required for the erection of structures in or over navigable waters not lying wholly within a State, " The act does not make Congress the source of the right to build but assumes that the right comes from another source, that is, the State "; it merely subjects the exercise of the right " to the further condition of getting from Congress consent to action upon the grant." *International Bridge Co.* v. *New York*, 254 U.S. 126, 133.

It is not necessary to decide whether, in view of the impassable condition of the portion of the Pigeon River under consideration, the improvements came under the provisions of either § 9 or § 10 of the Act of March 3, 1899,[15] as we are of the opinion that the improvements were made with the consent of Congress. By the Act of March 3, 1901 [16] (which apparently was not brought to the attention of the Circuit Court of Appeals), the Congress expressly authorized the Pigeon River Company to improve the river in order that it might be rendered navigable for floating logs, to erect dams and other works necessary for that purpose, and to impose a reasonable charge for the passage of all timber save that which was cut from the adjoining Grand Portage Indian Reservation. The fact that this authority directly applied to that part of the Pigeon River known as " the cascades " does not, in our judgment, detract from the significance of the Act as showing the acquiescence of the Congress in the improvements here in question. The authority was given because of the governmental interest in the Indian Reservation adjacent to the Pigeon River, and

[14] 30 Stat. 1151.

[15] See *United States* v. *Rio Grande Irrigation Co.*, 174 U.S. 690, 707, 708; *Leovy* v. *United States*, 177 U.S. 621, 628; *Economy Light & Power Co.* v. *United States*, 256 U.S. 113, 123, 124; *Wisconsin* v. *Illinois*, 278 U.S. 367, 412, 413.

[16] See Note 9.

it is obvious that the works at the cascades would have been futile if the related portions of the river required for the contemplated flotation of timber were not appropriately improved. The consent of the Congress, running expressly to the Pigeon River Company as a corporation organized under the applicable laws of Minnesota, for the erection of the structures at the cascades where the interests of the Indian Reservation were involved, necessarily implied acquiescence in the action by the State in authorizing the improvements which would accomplish the purpose which the Congress had in view. Nor does it affect the question that the congressional authorization was stated to be subject to such regulations and conditions as the Secretary of the Interior might prescribe. It is not shown that the Secretary has imposed restrictions and the Act did not require him to impose them.

We find no reason for regarding this action as intended to abrogate or modify the provision of the Webster-Ashburton Treaty. So far as the Act of Congress specifically authorized the charging of tolls for the use of the improvements on the Minnesota side of the boundary, it would control in our courts as the later expression of our municipal law, even though it conflicted with the provision of the treaty and the international obligation remained unaffected. *The Cherokee Tobacco*, 11 Wall. 616, 621; *Head Money Cases*, 112 U.S. 580, 597; *Cook* v. *United States*, 288 U.S. 102, 120. But the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress. *Chew Heong* v. *United States*, 112 U.S. 536, 549; *United States* v. *Payne*, 264 U.S. 446, 449; *Cook* v. *United States; supra*. We think that it is proper to infer that the Congress, in view of the condition of the stream and the purpose of the improvements, did not consider the authority to make them and to impose a reasonable charge for their use, as being inconsistent with the treaty

stipulation. We regard the action of the Congress, following that of the State, as a practical construction of the treaty as permitting these works and justifying the charge.

The same may be said of the action of the Province of Ontario in providing for the complementary works on the Canadian side of the boundary and authorizing tolls for their use. While this action was taken in the plenitude of the power of the provincial legislature as defined by the Supreme Court of Canada, we perceive no reason for ascribing to that legislature an intention to override the provision of the treaty, but rather see in that action an assumption on the part of the legislature that its course was not repugnant to the treaty, an inference which finds abundant support in the conclusion of the majority of the judges of the Supreme Court of Canada. Nor does it appear that either of the Parties to the treaty has made to the other any representations as to a breach of obligation by reason of the making of the improvements or the imposition of tolls. We find no ground for rejecting the practical construction which the treaty has thus received.

Further, in 1909, for the purpose of settling all questions pending between the United States and the Dominion of Canada, " involving the rights, obligations or interests of either in relation to the other or to the inhabitants of the other, along their common frontier," the United States and Great Britain entered into a treaty concerning the boundary waters.[17] By Article I of this treaty the Parties formulated their agreement " that the navigation of all navigable boundary waters shall forever continue free and open for the purposes of commerce to the inhabitants and to ships, vessels and boats of both countries

---

[17] 36 Stat. 2448, U.S. Treaties, vol. 3, p. 2607.

equally." [18]   The treaty expressly refers to uses and obstructions of boundary waters which had theretofore been permitted, and sets up an International Joint Commission with jurisdiction to deal with future uses and obstructions, as stated.   Article III of the treaty thus provides: " It is agreed that, in addition to the uses, obstructions, and diversions heretofore permitted or hereafter provided for by special agreement between the parties hereto, no further or other uses or obstructions or diversions, whether temporary or permanent, of boundary waters on either side. of the line, affecting the natural level or flow of boundary waters on the other side of the line, shall be made. except by authority of the United States or the Dominion of Canada within their respective jurisdictions and with the approval, as hereinafter provided, of a joint commission to be known as the International Joint Commission."

---

[18] Article I of the Treaty of 1909 is as follows:

" The High Contracting Parties agree that the navigation of all navigable boundary waters shall forever continue free and open for the purposes of commerce to the inhabitants and to the ships, vessels, and boats of both countries equally, subject, however, to any laws and regulations of either country, within its own territory, not inconsistent with such privilege of free navigation and applying equally and without discrimination to the inhabitants, ships, vessels, and boats of both countries.

" It is further agreed that so long as this treaty shall remain in force, this same right of navigation shall extend to the waters of Lake Michigan and to all canals connecting boundary waters, and now existing or which may hereafter be constructed on either side of the line. Either of the High Contracting Parties may adopt rules and regulations governing the use of such canals within its own territory and may charge tolls for the use thereof, but all such rules and regulations and all tolls charged shall apply alike to the subjects or citizens of the High Contracting Parties and the ships, vessels, and boats of both of the High Contracting Parties, and they shall be placed on terms of equality in the use thereof."

We think it may fairly be said that the improvements here in question on the Pigeon River constituted structures and uses which had been permitted by the Parties prior to the treaty of 1909 and were recognized by that treaty. It does not appear that any action has been taken by either Government or by the International Joint Commission inconsistent with this view.

We conclude that it was error to sustain the demurrer to the amended complaint. The judgment of the Circuit Court of Appeals is reversed and the cause is remanded for further proceedings in conformity with this opinion.

*Reversed.*