**SENECA NATION OF INDIANS, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 468, Docket 28817.**

United States Court of Appeals
Second Circuit.

Argued June 1, 1964.

Decided Oct. 29, 1964.

**56**

Moore, Circuit Judge, dissented.

Arthur Lazarus, Jr., Washington, D. C. (David E. Birenbaum and Strasser, Spiegelberg, Fried, Frank & Kampelman, Washington, D. C., of counsel), for appellant.

Edmund B. Clark, Atty., Dept. of Justice, Washington, D. C. (Ramsey Clark, Asst. Atty. Gen., John T. Curtin, U. S. Atty., Buffalo, N. Y., and Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before MOORE, KAUFMAN and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

The Seneca Nation of Indians appeals from an order of the United States District Court for the Western District of New York granting summary judgment to the United States in a condemnation suit. On October 11, 1963 the United States began condemnation proceedings to acquire certain land in Cattaraugus County, New York in connection with the Allegheny Reservoir Project. The Seneca Nation filed an answer specifically denying that the portion of its land was necessary for the dam and further denied that Congress had authorized the taking of the land in question. The United States moved for judgment on the pleadings. Both sides filed affidavits and after oral argument the summary judgment and order of possession were granted in favor of the United States. We affirm the judgment.

This appeal presents an exceedingly narrow issue. While asserting rights under the Treaty of November 11, 1794 (7 Stat. 44) between the United States and the Seneca Nation to keep its lands inviolate, the Seneca Nation also recognizes the power of Congress to take or to sanction the taking of its land for public purposes without regard to the treaty. Cherokee Nation v. Southern Kansas Ry. Co., 135 U.S. 641, 10 S.Ct. 965, 34 L.Ed. 295 (1890); United States v. Klamath & Moadoc Tribes, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938). See Tuscarora Nation of Indians v. Power Authority, 257 F.2d 885 (2 Cir.), cert. denied, 358 U.S. 841, 79 S.Ct. 66, 3 L.Ed.2d 76 (1958). Indeed, there is no question of the right of the United States to condemn the land here in question for the public purpose of constructing the reservoir project. Seneca Nation of Indians v. Brucker, 104 U.S. App.D.C. 315, 262 F.2d 27 (D.C.Cir. 1958), cert. denied, 360 U.S. 909, 79 S.Ct. 1294, 3 L.Ed.2d 1260 (1959).

■■ The replacement or relocation of existing highways unquestionably is a part of the reservoir project authorized by Congress. Act of June 28, 1938, 52 Stat. 1215, as amended, 33 U.S.C.A. § 701c–1. The land involved in this action is land necessary to extend the rerouted Route 17 from a two-lane to a four-lane limited access highway. The decision to make this extension was made by the Secretary of the Army and Congress delegated this authority to the Secretary. See 33 U.S.C.A. § 701c–1; 33 U.S.C.A. § 701r–1(c). As my Brother Moore once recognized, Tuscarora Nation of Indians v. Power Authority, 257 F.2d 885, 893 (2 Cir.), cert. denied, 358 U.S. 841, 79 S.Ct. 66, 3 L.Ed.2d 76 (1958), Congress need not itself specifi-

·cally and expressly authorize by "special ·enactment" each particular taking of Indian land, but can choose to delegate some of its authority to administrative ·offices and agencies. We see no reason to interfere with this reasonable exer- ·cise of delegated administrative discre- tion as to the amount of land required for the relocation of the road. Shoe- maker v. United States, 147 U.S. 282, 13 ·S.Ct. 361, 37 L.Ed. 170 (1893); Berman ·v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). It is hard to see how ·a four-lane road will interfere with com- ·munication among the Senecas so much more than a two-lane road and, as the District Court found, the increased high- ·way requirements result in part from the Allegheny Reservoir Project itself. Because the Secretary of the Army acted ·within his authority and reasonably, we ·affirm the judgment.

MOORE, Circuit Judge (dissenting).

I must dissent.

"Great nations, like great men, should keep their word." (Mr. Justice Black, ·dissenting, The Chief Justice and Mr. Justice Douglas, joining, in F. P. C. v. ·Tuscarora Indian Nation, 362 U.S. 99, 142, 80 S.Ct. 543, 567, 4 L.Ed.2d 584.) Now, by curious anomaly, it is the Gov- ·ernment which is the Indian giver and the Government which breaks its word. The majority justify their affirmance by premising it upon "an exceedingly nar- ·row issue." In syllogistic form, the ar- ·gument is that Congress has the power to take Indian lands for public purposes without regard to treaties; that the ·construction of a reservoir project is a public purpose; that relocation of exist- ·ing highways is part of the reservoir project; that Congress delegated to the Secretary of the Army the power to use "administrative discretion as to the amount of land required for the reloca- ·tion of the road; and that [the illogical

*non sequitur*] the land condemned (not by Congress but by "administrative dis- cretion") is "necessary to extend the re- routed Route 17 from a two-lane to a four-lane limited access highway." At a time when so much attention is being paid to so-called "civil rights" which are statutorily created because of certain racial problems, some consideration might well be given to the Indian race and to those "just rights" which Presi- dent Washington assured the Senecas this Government would protect.[1] And if the "King" (of England) "never coerced a surrender of them [their lands]," so much the more should "the Great Council of the United States" show the faithful care which the United States [now] means to take for the protection of ·[your] lands." [2]

Despite these high-sounding protes- tations of enduring good faith, against what factual background does the Sec- retary of the Army decide that the State of New York should have a four-lane, fenced-in, limited-access highway, divid- ing the Senecas as effectively as if a Chinese Wall separated one part of the reservation from the other?

Pursuant to the Treaty of November 11, 1794 (7 Stat. 44), the Seneca Nation has held the reservation now invaded. Notwithstanding the promise of the United States to "never claim the same, nor, disturb the Seneca nation" and to protect the Seneca's right of perpetual occupancy, this commitment has been modified from time to time by projects which the Congress has believed to be in the national interest such the the type of flood control[3] here involved. The Kinzua Dam Project required the taking of some 10,000 acres of land inside the Allegheny Reservation. This land was condemned with court approval. See United States v. 21,250 Acres of Land, etc., 161 F.Supp. 376 (W.D.N.Y.1957); Seneca Nation v. Brucker, 262 F.2d 27

---

1. 4 American State Papers (Indian Affairs, Vol. I, 1832) 142.

2. Pickering Papers, Mass.Hist.Soc. 60:- 224–229.

3. Flood Control Act of June 28, 1938, 52 Stat. 1215, as amended.

(D.C.Cir., 1958), cert. den., 360 U.S. 909, 79 S.Ct. 1294, 3 L.Ed.2d 1260 (1959).

The flooding of these lands necessitates the relocation of New York State Route 17, an existing two-lane highway which runs through the Reservation. Mindful that its "water resources projects" might require relocation of roads, Congress specifically provided that "when the taking by the Federal Government of an existing public road necessitates replacement, the substitute provided, will, as nearly as practicable, serve in the same manner and reasonably as well as the existing road" and that "The traffic existing at the time of the taking shall be used in the determination of the classification." However, a Congressional Act, Section 207, Act of July 14, 1960, 74 Stat. 500, as amended, 76 Stat. 1196, 33 U.S.C.A. § 701r–1(c), provides that "In any case where a State or political subdivision thereof requests that such a substitute road be constructed to a higher standard than that provided in the preceding provisions of this subsection, and pays, prior to commencement of such construction, the additional costs involved due to such higher standard, such Agency head is authorized to construct such road to such higher standard." But this statute was enacted for "water resources" projects generally and was not directed towards the taking of property on an Indian Reservation.

The power of Congress to take Indian Reservation lands for public purposes without regard to prior treaty promises is established. United States v. Klamath and Moadoc Tribes, 304 U.S. 119, 124, 58 S.Ct. 799, 82 L.Ed. 1219 (1938); Cherokee Nation v. Southern Kansas Ry. Co., 135 U.S. 641, 10 S.Ct. 965, 34 L.Ed. 295 (1890). But the real "narrow issue" posed by the very decision authorizing the taking of the Seneca's lands for the Allegheny Reservoir Project is "whether Congress has, in a sufficiently clear and specific way, shown an 'intention to abrogate or modify a treaty.'" Such an intention "is not to be lightly imputed to the Congress." Pigeon River Improvement, Slide and Boom Co. v. Cox, 291 U.S. 138, 160, 54 S.Ct. 361, 367, 78 L.Ed. 695 (1924).

There are cities in New York State which could well be connected by four- or six-lane, limited-access highways where the most direct route might well be through an Indian Reservation. If New York State applied to Congress for the right to take Indian lands for such a superhighway, then Congress would have to make a decision whether to respect the Treaty or yield to so-called "progress." However, Congress has not been faced with, or passed upon, this question. The proposed for the future, four-lane, limited-access "Southern Tier Expressway" which New York State envisions for itself in the future was not part of the Allegheny Reservoir Project and could not have even impliedly been embraced within Congressional approval.[4] A fortiori, if Congress itself did not approve such a highway, it could not have intended to invest an administrative officer with the power to condemn property for a purpose which Congress had not authorized.

No argument should be required for the proposition that the Secretary of the Army is not authorized at the behest of the State of New York to condemn private property—much less Indian treaty-protected property. Yet for all practical purposes, this taking is tantamount to such a condemnation. Under the guise of a road of "a higher standard" New York State is, in effect, promoting a public highway project quite independent of the water resources projects authorized by Congress.

The Supreme Court has said that "It is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council and

---

4. McKinney's Consolidated Laws of New York, Book 24, Part 2, Highway Law, c. 25, § 340–c, L.1962, c. 878, eff. April 29, 1962.

in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people." Tulee v. Washington, 315 U.S. 681, 684–685, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942). As early as 1866 the Supreme Court said as to the Seneca nation that "The United States have acknowledged the reservations to be the property of the Seneca nation—that they will never claim them nor disturb this nation in their free use and enjoyment, and that they shall remain theirs until they choose to sell them. These are the guarantees given by the United States, and which her faith is pledged to uphold." The New York Indians, 5 Wall. (72 U.S.) 761, 768, 18 L.Ed. 708. For the national welfare, Congress has had to encroach upon these guarantees. This encroachment has been recognized and well expressed in F. P. C. v. Tuscarora Indian Nation, supra, 362 U.S. p. 141, 80 S.Ct. p. 567 (dissenting opinion, Mr. Justice Black):

> "Of course, Congress has power to change this traditional policy when it sees fit. But when such changes have been made Congress has ordinarily been scrupulously careful to see that new conditions leave the Indians satisfied. Until Congress has a chance to express itself far more clearly than it has here the Tuscaroras are entitled to keep their reservation. It would be far better to let the Power Authority present the matter to Congress and request its consent to take these lands. It is not too late for it to do so now. If, as has been argued here, Congress has already impliedly authorized the taking, there can be no reason why it would not pass a measure at once confirming its authorization.

Would it not be far more consistent with the Indian policy so frequently expressed by Congress and the Supreme Court to let Congress decide whether it wishes to give to the State of New York the power to condemn Indian land for a superhighway rather than to impute to Congress an intent to vest the Secretary of the Army with such powers.

Finally, it is not amiss to note the willing cooperation of the Senecas with the wishes of the "Great Council" which has authorized the taking of their lands for flood control. They have even acquiesced gracefully in the necessitous relocation of Route 17. Their only objection is to the construction of a superhighway which will bar access from one part of their reservation to the other, will separate neighbor from neighbor and which, as they represent, "will restrict the areas where Senecas forced to relocate by the Kinzua Dam may live and will significantly disrupt intrareservation traffic." Their petition (as expressed in this litigation) to the "Great Council" (judicial) to have that other "Great Council" (legislative) determine whether this situation shall come to pass is not unreasonable.