**DEFENDERS OF WILDLIFE, INC., Appellant,**

v.

**The ENDANGERED SPECIES SCIENTIFIC AUTHORITY, et al.**

No. 83–1019.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 14, 1983.

Decided Jan. 10, 1984.

---

David Medine, Washington, D.C., with whom Brice M. Clagett, Stephen D. Barnes and Ellen Bass, Washington, D.C., were on the brief, for appellant.

Albert M. Ferlo, Jr., Atty., Dept. of Justice, Washington, D.C., with whom Carol E. Dinkins, Asst. Atty. Gen., Dianne H. Kelly and Dirk D. Snel, Attys., Dept. of Justice, Washington, D.C., were on the brief, for federal appellees.

William A. Hutchins, Washington, D.C., with whom Paul A. Lenzini, Washington, D.C., was on the brief, for appellee, Intern. Ass'n of Fish & Wildlife Agencies.

Paul A. Kiefer and Matthew D. Shannon, Washington, D.C., were on the brief, for appellee, Fur Conservation Institute of America. John C. Morrison, Washington, D.C., also entered an appearance for appellee, Fur Conservation Institute of America.

Stephen S. Boynton, Washington, D.C., entered an appearance for appellees, Driscoll, et al.

Before WILKEY and BORK, Circuit Judges, and LUMBARD,* Senior Circuit Judge, United States Court of Appeals for the Second Circuit.

Opinion for the Court filed by Senior Circuit Judge LUMBARD.

LUMBARD, Senior Circuit Judge:

■ Defenders of Wildlife, Inc., appeals from an order of the District Court for the District of Columbia, June L. Green, J., granting federal defendants' motion[1] to va-

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Federal defendant appellees are the Endangered Species Scientific Authority (ESSA) and the Fish and Wildlife Service of the Depart-

cate that court's previously issued injunction. The injunction barred defendants from authorizing the export of bobcats until guidelines were issued satisfying the requirements this court set out in *Defenders of Wildlife v. ESSA,* 659 F.2d 168 (D.C.Cir.), cert. denied, 454 U.S. 963, 102 S.Ct. 503, 70 L.Ed.2d 378 (1981) (*"Defenders I "*). Judge Green ruled that Congress, in a subsequent amendment to the Endangered Species Act, Pub.L. No. 97–304, 16 U.S.C. § 1537a, overruled the decision in *Defenders I,* thereby removing the basis for the injunction. Accordingly, she vacated the injunction under Fed.R.Civ.Pro. 60(b)(5). We affirm.

The bobcat (lynx rufus) is found throughout the United States in sufficient numbers that it is not listed as endangered or threatened under the Endangered Species Act, 16 U.S.C. §§ 1531–1543 (1982). International trade in bobcats, however, is governed by the Convention on International Trade in Endangered Species of Wild Fauna and Flora, *opened for signature* March 3, 1973, 27 U.S.T. 1087, T.I.A.S. No. 8249 ("CITES"). By virtue of its membership in the cat family, the bobcat is included in Appendix II of CITES as a species "which although not necessarily now threatened with extinction may become so unless trade in specimens of such species is subject to strict regulation." Under Article IV, Sec. 2 of CITES, exports of Appendix II animals are authorized only to the extent that each nation's "Scientific Authority" determines that "such export will not be detrimental to the survival of the species. . . . " Currently, the Fish and Wildlife Service, an arm of the Department of Interior, through its Office of Scientific Authority, is the United States

agency for purposes of making "no detriment" findings.[2]

CITES deals solely with international trade in the listed species. Neither CITES nor the Endangered Species Act, which implemented CITES,[3] deals with the actual killing of bobcats. Primary responsibility for the protection, management, and regulation of killing of bobcats in this country rests with the states. Although CITES requires "no detriment" findings from each nation as a whole, the Fish and Wildlife Service summarizes data collected by the states, and issues its findings on a state by state basis.

In 1979, Defenders of Wildlife brought suit challenging the federal findings of "no detriment" for thirty-five states and the Navajo Nation for the 1979–80 season, and the guidelines under which those findings were made. Those guidelines, which were based on the recommendations of a Working Group composed of scientists and wildlife managers, measure detriment primarily by population trend data. This court held those guidelines invalid on the ground that they failed to consider total bobcat population in each state or the number to be killed in a particular season in each state, and required the Scientific Authority to await the development of that additional data before authorizing the export of bobcats. 659 F.2d at 178.

On remand, the district court, on April 23, 1981, permanently enjoined defendants "from authorizing export of bobcats taken or killed subsequently to July 1, 1981, until they promulgate guidelines consistent with the Court of Appeals decision and make findings on the basis of those guidelines."[4]

---

ment of Interior. When this lawsuit was initiated in 1979, ESSA was the Scientific Authority and the United States Fish and Wildlife Service was the Management Authority under the Convention. In December, 1979, Congress amended the Endangered Species Act, and directed the Fish and Wildlife Service to perform both functions. 16 U.S.C. § 1537a (Supp. III 1979). Subsequently, the Fish and Wildlife Service created the office of Scientific Authority to perform the duties of the Scientific Authority.

Defendant-Intervenors include the International Association of Fish and Wildlife Agen-

cies, which represents state wildlife authorities, the Fur Conservation Institute of America, and various individual fur trappers and buyers.

2. *See* note 1 *supra.*

3. *Defenders of Wildlife v. ESSA,* 659 F.2d 174.

4. On December 15, 1981, the district court reviewed guidelines issued after the *Defenders I* opinion, found them still inadequate, and denied defendants' motion to vacate the injunction.

On October 13, 1982, the Endangered Species Act Amendments of 1982, Pub.L. No. 97–403, were signed into law. Section 5(1) of those amendments ("the amendment") added paragraph c(2) to Section 8A of the Endangered Species Act of 1973, 16 U.S.C. 1537a (1982):

> The Secretary[5] shall base the determinations and advice given by him under Article IV of the Convention [*i.e.,* CITES] with respect to wildlife upon the best available biological information derived from professionally accepted wildlife management practices; but is not required to make, or require any state to make, estimates of population size in making such determinations or giving such advice.

In addition, Congress provided that this paragraph was effective from January 1, 1981.

This appeal concerns the extent to which Congress overruled *Defenders I.* Appellant argues that Congress eliminated only the need for population data, and that information on projected kill levels from each state is still necessary before a "no detriment" finding can be issued for that state. Thus, they argue that the district court's injunction should have been modified, not vacated. Judge Green held that Congress overruled both requirements set forth in *Defenders I,* thereby removing the basis for the injunction. Based on our reading of the language and legislative history of the amendment, we agree with the district court.

## II.

Our objective is to "ascertain the Congressional intent and give effect to the legislative will." *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). The starting point in interpreting a statute, of course, is the language of the provision. *E.g., Consumer Product Safety Commn. v. GTE Sylvania, Inc.,* 447 U.S. 102, 107, 100 S.Ct. 2051, 2055, 64 L.Ed.2d 766 (1980). Appellant relies principally on the negative implication of the second clause of the amendment, which reads "but [the Secretary] is not required to make, or require any state to make, estimates of population size in making such determinations or giving such advice." Appellant argues that since Congress expressly stated that the Secretary need not generate, or require state authorities to generate, population estimates before making "no detriment" findings, but was silent in regard to projected kill levels, Congress left intact the part of *Defenders I* requiring the Secretary to consider kill levels. As support for this argument, appellant points out that language which would have allowed the Secretary discretion to require the establishment of target kill levels was dropped from the final version of the amendment. *See* section 4 of H.R. 6133, as adopted by the House Subcommittee on Fisheries, Wildlife Conservation and the Environment.

We disagree with appellant's reading of the language of the amendment. In *Defenders I,* the court stated the appropriate methodology to be used in making "no detriment" findings. Rejecting the Working Group's recommendation that population trend data be used instead of absolute population figures, the court stated that "[w]e do not see how, without adequate information on total bobcat population and the number to be killed in a particular season, the Scientific Authority can make a valid determination of 'no detriment'." 659 F.2d at 177. Defenders of Wildlife erroneously reads that language as mandating that each requirement be considered independently of the other. On the contrary, the opinion concluded that "[t]he two factors—population and number to be killed—are so interrelated that a valid finding of 'no detriment' cannot be made without adequate data about both of them." *Id.* Thus, even if Congress's only action were to remove the population requirement, we could not

---

**5.** As used in 16 U.S.C. 1537a, and in this opinion, "Secretary" means Secretary of the Interi-  or.

accept the argument that Congress, by its silence, intended to preserve the kill level requirement since, as this court said, that requirement is meaningless by itself.

Congress, however, did not merely remove the population level requirement. We need only look to the first clause of the amendment, which appellant's brief ignores, to see that Congress affirmatively replaced the *Defenders I* methodology with a different approach: the Secretary shall now use "the best available biological information derived from professionally accepted wildlife management practices" in making "no detriment" findings. At oral argument, appellant conceded that had the amendment stopped there, its argument about selective overruling would fail. We do not read the second clause with a negative implication, as we must for appellant to prevail. Instead, we view it as emphasizing that, while information on population levels may be relevant, it is not so essential that it must be generated by the federal government if unavailable from state wildlife authorities.[6]

The legislative history of the amendment supports our conclusion, based on our reading of the statutory language, that Congress did not selectively overrule *Defenders I.* The House, Senate, and Conference Reports all mention *Defenders I,* and state that the amended section 8A "overrules" that decision. H.R.Rep. No. 97–567, 97th Cong., 2d Sess. 29 (1982) (House Report); S.Rep. No. 97–418, 97th Cong., 2d Sess. 22 (1982) (Senate Report); H.Conf.Rep. No. 97–835, 97th Cong., 2d Sess. 28 (1982), U.S. Code Cong. & Admin.News 1982, 2807. Appellant quotes one House member who interprets the amendment as "selectively" overruling that portion of our opinion that requires reliable population estimates. 128 Cong.Rec.H. 3248 (daily ed. June 8, 1982) (remarks by Rep. Schneider). We do not consider the remarks of a single member of Congress as particularly weighty, particularly since none of the Reports uses the term "selectively" when describing the effect of the amendment upon our prior decision.

The Reports evidence a clear rejection of the methodology stated in *Defenders I.* They state that "the ruling of the court is not based on sound wildlife management." House Report at 29; Senate Report at 22, U.S.Code Cong. & Admin.News 1982, at 2829. The House Report states that the court's "finding has caused serious concern in the professional wildlife community," noting in particular the population and kill level requirement. House Report at 16–17, U.S.Code Cong. & Admin.News 1982, at 2816. The House Report then goes on to describe the testimony given by wildlife managers to the effect that it is virtually impossible to establish reliable population estimates for an elusive species like bobcat, House Report at 16–17; and that it is also unnecessary to do so in view of the fact that estimates of population trends, readily ascertainable from "habitat information, indices of population size, age and sex structure, and harvest information" are equally reliable indicators of the condition of a population. House Report at 29; Senate Report at 22, U.S.Code Cong. & Admin.News 1982, at 2829.

Furthermore, both the House and Senate Reports contain identical language expressly addressing kill level data which lends support to our conclusion that such data is not required: "In making his CITES findings, the Secretary *may* require the establishment of target harvest levels and tagging procedures to ensure that export of any species ... will not be detrimental to the survival of the species." House Report at 30, Senate Report at 23 (emphasis added), U.S.Code Cong. & Admin.News 1982, at 2830. Appellant points to the fact that this language appeared in an earlier version of the bill but was dropped as evidence of congressional intent to leave the kill level

---

**6.** The Fish and Wildlife Service concedes that, pursuant to the legislative history of the amendment, if population data is already available from state authorities, "such information should be considered with other data in making export decisions." H.R.Rep. No. 97–567, 97th Cong., 2d Sess. 29 (1982); S.Rep. No. 97–418, 97th Cong., 2d Sess. 22 (1982), U.S.Code Cong. & Admin.News 1982, 2807, 2829.

requirement intact. We disagree. First, that the language was dropped from the text of the bill, remaining only in the Reports, indicates to us nothing more than that the language was deemed unnecessary since the "best available information" standard already allowed use of kill data at the discretion of the Secretary. Second, we think it highly unlikely that language giving the Secretary discretion to require the use of kill levels would survive in both Reports if in fact Congress intended to mandate their use. Thus, nothing in the language or legislative history of the amendment gives us any reason to doubt the statements in House, Senate, and Conference Committee Reports that Congress "overruled" *Defenders I.*[7] That being so, we agree with the district court's holding that the basis for its injunction had been statutorily removed, and affirm the vacation of its injunction under Fed.R.Civ.P. 60(b)(5).[8]

### III.

Appellant contends that, even if the district court was correct in vacating its injunction, it should have retained jurisdiction so that it could monitor federal defendants' conduct for at least one complete season. Appellant points to the observation in *Defenders I* that "the Scientific Authority often seemed primarily concerned with an acceptable basis for authorizing bobcat exports despite the absence of convincing factual grounds for making no detriment findings," 659 F.2d at 178, and the district court's statement that defendants' subsequent guidelines for the 1981–82 season, which were rejected as not satisfying *Defenders I,* "demonstrate an unchanged attitude." December 15, 1981 Mem. Op. at 4.

We agree with the district court's dismissal of this action. Congress, through the amendments to the Endangered Species Act, has announced a new standard for the federal defendants to follow. Thus, plaintiff's challenge to the prior guidelines as violative of the old *Defenders I* standard is now moot. While a court may retain jurisdiction over an action despite the voluntary cessation of illegal activity if it suspects that "the wrong may be repeated," *De Funis v. Odegaard,* 416 U.S. 312, 318, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974) (per curiam); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953), in this case the entire basis for the court's jurisdiction has been removed.[9]

The federal defendants have responsibility in the first instance to incorporate Congress's mandate into guidelines and to make findings pursuant to those guidelines using

**7.** It is true, as appellant argues, that the Reports concentrate on explaining why population estimates are not needed, and say little about estimates of kill levels. However, we think that lop-sided treatment is readily explained by the former requirement being the more burdensome of the two requirements established in *Defenders I,* and by Congress's feeling the need to stress that while exact population figures may be the best *possible* data, they are not always the best *available* data. In any event, we decline to infer from it that Congress meant to concentrate on the former requirement to the exclusion of the later.

**8.** Appellants contend that the district court's vacation of its injunction created a conflict with our obligations under CITES. They argue that after *Defenders I,* the Secretary was required, as a matter of treaty obligation, to obtain population and kill level data before making "no detriment" findings. While Congress can, as a matter of domestic law, abrogate treaty obligations, it must do so clearly, *e.g., Menominee Tribe v. United States,* 391 U.S. 404, 412–13, 88 S.Ct. 1705, 1710–11, 20 L.Ed.2d 697 (1969) quoting *Pigeon River Co. v. Cox Co.,* 291 U.S. 138, 160, 54 S.Ct. 361, 367, 78 L.Ed. 695 (1934). Appellants argue that since Congress was silent on the kill level requirement, that requirement remains in force as a matter of treaty obligation. Since we find, however, that Congress clearly overruled *Defenders I,* we need not address appellant's argument concerning the force of *Defenders I* in creating treaty obligations. The district court's vacation of its injunction, allowing for implementation of the "best available biological information" standard, then, creates no conflict with our obligations under CITES.

**9.** Even if the case were not moot, there is no reason to believe that the FWS would show hostility toward enforcing the new standard, since it squares with the approach the FWS has advocated throughout this litigation.

"the best available biological information derived from professionally accepted practices used in wildlife management." On April 18, 1983, the Fish and Wildlife Service published its final 1982–83 guidelines and findings of "no detriment" for exports of bobcat from 37 states, the Klamath Tribe and the Navajo Nation. 48 Fed.Reg. 16,-494, 16,496. As the district court held, any challenge to the guidelines and findings constitutes a new case or controversy, and must come in the form of a new action. *Center for National Policy v. Richardson,* 534 F.2d 351 (D.C.Cir.1976).

Because the district court correctly held that 16 U.S.C. § 1537a removed the basis for its injunction, and any further challenge to the federal defendants' compliance with bobcat export regulations must be brought in a subsequent action, the opinion of the district court is

*Affirmed.*