UNITED STATES of America,
Plaintiff,

v.

205.03 ACRES OF LAND, MORE OR LESS, Situate IN WARREN COUNTY, STATE OF PENNSYLVANIA, and Clifford Halftown et al., Defendants.

UNITED STATES of America,
Plaintiff,

v.

266.13 ACRES OF LAND, MORE OR LESS, Situate IN WARREN COUNTY, STATE OF PENNSYLVANIA, and James G. Pierce et al., Defendants.

UNITED STATES of America,
Plaintiff,

v.

268.17 ACRES OF LAND, MORE OR LESS, Situate IN WARREN COUNTY, STATE OF PENNSYLVANIA, and Norma Patterson et al., Defendants.

Civ. A. Nos. 1137–1139 Erie.

United States District Court
W. D. Pennsylvania.

March 2, 1966.

James P. McKenna, Robert E. Tucker, Asst. U. S. Attys., Pittsburgh, Pa., for the Government.

John H. Stewart, Warren, Pa., Benjamin C. Perreault, Salamanca, N. Y., John M. McLaughlin, Erie, Pa., Joseph Malizia, Emporium, Pa., Richard E. Brandow, Bradford, Pa., for the landowners.

WILLSON, District Judge.

These several tracts of land were condemned by the United States as needed in the construction of the Allegheny River Reservoir, commonly known as the Kinzua Dam. These lands are a portion of what is known as the Cornplanter Grant. The Indians owning these lands are members of the Seneca Nation but heirs of Cornplanter, a Seneca Chief during his lifetime. The lands were granted to Cornplanter by the Commonwealth of Pennsylvania in recognition for his services during and after the Revolutionary War. Lands of the Seneca Nation have also been condemned for use in this reservoir project. But it is to be noticed that they are reservation or Indian lands held in common by the Tribe. The United States Courts have upheld the right of the Government to condemn Indian

lands for the construction of this and other projects. See United States v. 21,250 Acres of Land etc., 161 F.Supp. 376 (D.C.1957); Seneca Nation of Indians v. United States, 338 F.2d 55, (2 Cir. 1964); and Federal Power Comm. v. Tuscarora Indian Nation, 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960). But the issue before this Court in the instant motion takes a different slant because the sole issue now is the amount of just compensation to be awarded the Indian owners of these private lands. Attached hereto for explanatory purposes is Appendix 1—an excerpt from a History of Northwestern Pennsylvania, Vol. I, by Joseph Riesenman, Jr., and published by Lewis Historical Publishing Co., Inc. Appendix 2 is a copy of a statute enacted by the General Assembly of Pennsylvania, approved May 16, 1871, P.L. 879. It is this statute and the effect thereof which gives rise to the present controversy. The issue of just compensation as to these several tracts of Cornplanter land privately owned by individual Indians—heirs of Chief Cornplanter—came on for jury trial at the November Session 1965 in Erie. The only trial issue of any consequence was whether the Jury should consider these lands as held by the Indians in their tax free status but subject to the restriction as to alienation—both of which are provided for in the Pennsylvania 1871 statute. At the trial the Government strongly contended that the issue as to just compensation was to be determined as it is in other land cases, that is—the evidence was to be restricted to that of fair market value—no consideration being given to the tax free status, because the Government urged that is an incident peculiar to the owner—not to the land.

Counsel for the Indian owners, of course, naturally took a contrary position. The Court permitted the statute to be introduced and charged the Jury to consider the tax free status of the land as mentioned in the statute, but at the same time directed the Jury's attention to Section 3 of the Statute which prohibits alienation to anyone but descendants of Cornplanter or members of the Seneca Nation of Indians. The testimony taken from the Indian rolls was that there were some 4,700 living Indians who would qualify as possible purchasers of these lands, as being members of the Seneca Nation of Indians or Cornplanter heirs.

The judgments on the Jury verdicts in these cases were entered by the Clerk on November 26, 1965. The instant motion for new trial in these three civil actions, that is—1137, 1138, and 1139—was filed on December 1, 1965. It is urged that the verdicts of the Jury did not conform to the legal standard of just compensation due to the charge of the Court that the tax exempt status was an element of value to be considered by the Jury. It is said also that the testimony of one Russell R. Lane was improperly admitted, as there was no support for his opinion of the fair market value as he included in his value consideration of the tax exempt status; and finally the Government says that the verdicts were excessive.

The United States Attorney on February 11, 1966, filed a supplemental motion for new trial. This motion mentions several other matters which this Court regards as of no consequence, but in any event it was filed more than 60 days after the 10 day period provided in Rule 59 for the service of the motion for new trial. The additional grounds for this motion need not be considered. See Greenwood v. Greenwood, 224 F.2d 318 (3rd Cir. 1955); Baird v. Aluminum Seal Co., 149 F.Supp. 874 (W.D.Pa. 1956); and Marks v. Philadelphia Wholesale Drug Company, 125 F.Supp. 369 (E. D.Pa.1954).

In this case as the Court understands it, the Government points to a case in the Second Circuit, Westchester County Park Commission v. United States, 143 F.2d 688 (1944), as authority for the proposition that error was committed in the trial of these cases. In that decision Judge Frank discusses at considerable length the concept of fair market value and the difficulty often encountered in applying it in condemnation cases. The

concept of fair market value in its usual sense cannot be applied to the land held by these Indians. That rule presupposes a willing seller and a willing buyer with the value being fixed by reference to comparable sales of similar lands in the vicinity. But that set of circumstances has not existed in the whole history of the Cornplanter grant. Under the evidence the jury determined just compensation based on the fact that Indians owned these lands under the Pennsylvania statute with all its benefits and restrictions. On this point it is believed that the Westchester County Park Commission v. United States case favors the rule applied in the instant cases rather than to the contrary as contended by the Government. For instance, the Court says on p. 692—

> "It may be that, if the County had proved the worth in money terms of the use as a park site, it would be entitled to compensation therefor."

In this Court's opinion that is exactly what was done in these Cornplanter cases. The Jury had the proof of the value of the lands as Indian-held lands. The market value test is not applied in all cases. This has been recognized by the Supreme Court in many instances, notably—Montana Railway Co. v. Warren, 137 U.S. 348, 11 S.Ct. 96, 34 L.Ed. 681 (1890), and reiterated again in a full discussion of the subject in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). These lands had no market in the usual sense and, therefore, resort to the best data available to ascertain just compensation was used. This is permissible under the Miller decision, and see also Hanson Lumber Co. v. United States, 261 U.S. 581, 43 S.Ct. 442, 67 L.Ed. 809 (1923); and Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S. Ct. 622, 37 L.Ed. 463 (1893). Thus, as this Court often says in instructing a Jury, the right of just compensation is never disputed, but the method of arriving at the amount thereof and the testimony as to what it is worth in the terms of money is always relevant in a condemnation case. In this case it seems to me that the Indians are entitled to have the land considered by the Jury with all its benefits and all its restrictions. It is land like no other land privately owned so far as this Court is able to determine. But for the Kinzua Dam the Indians owning this property would own it in perpetuity free from taxation. This status was granted by the State of Pennsylvania. Although these are private lands, the Indian owners are wards of the nation and not of the states, but the federal government has never relinquished its suzerainty over them. See Tuscarora Nation of Indians v. Power Authority, 257 F.2d 885 (2 Cir.) The tax exemption covenant on the Cornplanter lands given by Pennsylvania is the same status enjoyed by Indians in other parts of the nation as evidenced by the Federal Government's refusal to permit states to tax Indian properties. See Mahnomen County v. United States, 319 U.S. 474, 63 S.Ct. 1254, 87 L.Ed. 1527 (1943); and United States v. Rickert, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903). There are exceptions, but those are few in number. It is to be noticed in the statute exempting the land from taxation that the language does not refer to the owner—which is the Government's contention—but says:

> " * * * nor shall such lands, which held by the descendants of Corn Planter, or members of the Seneca nation of Indians, be liable to taxation, * * * "

Thus, the tax exempt status is in the nature of a covenant running with the land, and like most covenants it has its advantages and disadvantages. See 20 Am.Jur.2d, Covenants, § 30, p. 600. The land is tax free, but the alienation is restricted. It is this status with regard to the instant land that has a significant application in the instant cases. For instance, in Tracts 2321 and 2321–E, the deposit by the Government—based on its valuation apparently without regard to the tax free status—was $1425.00, whereas the Jury verdict was $3731.75. In Tract 3304, the deposit by the Government—$1200.00, whereas the Jury verdict was $5022.50. In Tract 3308, the de-

posit by the Government—$5250.00, whereas the Jury verdict was $30,436.00. In Tracts 3334 and 3334–E, the deposit by the Government—$5500.00, whereas the Jury verdict was $31,426.50. But my recollection is that the last two cases of land were river bottom soil and were well timbered. The point is that on these tracts—Tract 2321 (8.55 acres), Tract 2321–E (.47 acres), Tract 3304 (14.35 acres), Tract 3308 (89.96 acres), Tract 3334 (64.05 acres), and Tract 3334–E (1.84 acres)—there were no habitations and very little farming.

It appears from the briefs of counsel and their research on this subject that but little authority has been uncovered, but what has been cited seems to favor the ruling made during the course of these trials. For instance, 4 Nichols, Eminent Domain § 12.32, p. 224, states that the owner is entitled to the added value which the tax exempt status gives to his property. To the same effect is Orsel, Valuation Under the Law of Eminent Domain, (1953), § 45, p. 215. Both the textbook writers seem to base their authority on the Massachusetts decision—Old South Association v. City of Boston, which holds that the tax exempt status of the land adds to the value thereof. This decision was handed down in 1912 by the Supreme Court of Massachusetts, 212 Mass. 299, 99 N.E. 235.

■ The complaint is made in the second paragraph of the motion for new trial that the Court denied Government counsel's motion to strike the testimony of Russell R. Lane, expert witness for the landowners. As I examine the record, this motion appears on page 164 and was renewed on page 177 of the transcript. However, a careful reading of the testimony as transcribed indicated that Mr. Lane had support for his conclusions as to just compensation in these cases. The qualifications of the witnesses were for the Court. See United States v. 2,872.88 Acres of Land etc., 310 F.2d 775, (5 Cir. 1962). Mr. Lane for the landowners, as well as Messrs. Victor H. Samuelson and Leonard P. Kane for the Government, were all duly qualified as expert witnesses and permitted to give their opinions. These men had been qualified by this particular Trial Judge on several of the other just compensation trials for taking of lands for the Kinzua Dam. It seemed to the Court that Mr. McKenna for the Government in this instance was attempting to pin Mr. Lane down to one so-called approach—the market value approach—as the basis for his testimony. Mr. Lane had vast experience, as had the Government witnesses Samuelson and Kane. It is doubtful in the Court's mind whether experts of the caliber of these men could or should be tied down to one particular method of reaching an opinion on value. In any event, Mr. Lane took in many factors in reaching his opinion as did the other witnesses. As experienced witnesses, none of them put themselves in the position of relying upon one method or approach as the sole basis for their testimony. As Mr. Lane was qualified, the weight of his testimony was for the Jury, and a careful reading of the transcript will support the ruling of the Court.

■ The Jury which sat in these cases saw the charts and maps of the lands and their location on the Allegheny River. The Jury heard the lands fully and carefully described. In my opinion the Jury fully understood all the issues it had to determine. In these cases we are discussing wards of the nation and their property. Just compensation has been determined by a Jury of 12 citizens of the United States in a fair trial. As Trial Judge I believe that the United States Government should accept the findings of the 12 citizens who sat on the Juries in these cases. The Government says these verdicts were excessive. I do not agree. These Jurors may have brought in verdicts on the generous or high side, but still in my opinion they are just verdicts. This Court has in mind the statement of Judge Hastie in Lebeck v. William A. Jarvis, Inc., 250 F.2d 285, 288 (3 Cir. 1957), where he says in discussing verdicts that are excessive—

"* * * any claim that the verdict has been excessive requires a

trial court to decide no more than whether the jury has reached a result which could rationally and dispassionately be reached by laymen on the basis of evidence relevant to the several categories of legally recoverable damage."

The motion for new trial is denied.

## APPENDIX I

"However, by an Act of May 29, 1908, Congress specifically gave the Cornplanter heirs the right to bring actions in the circuit courts of the United States to recover possession of lands or to quiet titles. I have not been able to find that any action has been brought under this; but I am confident that, if and when the Cornplanter heirs get their financial wind, Oil City will be theirs, or they will know the reason why.

"The third tract is the present Cornplanter Grant in Warren County, which is now the permanent home of only about forty of the Cornplanter heirs living there near their Seneca friends and relatives on the Allegheny Reservation just over the New York state line. There are, however, nearly 550 persons with an interest in this property, whose legal status is most peculiar. The patent issued to Cornplanter, and his heirs and assigns, was like all others and conveyed the same title, except that he was not required to perfect it by settlement or payment. However, when Warren County was organized in 1819 for judicial purposes, taxes were assessed against the Grant and on one occasion the sheriff went to collect. He was received in silence in Cornplanter's house. Around the walls stood thirty of the chief's young men, each with a rifle. No word was said; but the sheriff was a smart man and could take a hint. The annoyance continued and notes were extracted from the chief which he probably thought settled the matter. When he learned that they only made it worse, he appealed once more to his old friend the governor of Pennsylvania. The response was handsome. Under date of April 2, 1822, the Legislature directed the state treasurer to pay the tax notes and all taxes due; exempted the Grant from any kind of taxes so long as Cornplanter or his heirs held it; provided heavy penalties for trespass on the property; and authorized the appointment of commissioners to interview the old chief and explain the objects of the act. On the sixth day of July, the chief met the state commissioners at Warren and delivered himself of a really good speech —the most eloquent that Warren County has ever heard, I am sure.

"Cornplanter died on February 18, 1836, and letters of administration were issued on May 29, 1837, to Robert Falconer. On August 31, the heirs petitioned the Warren County Orphans Court for a partition of the Grant, and an inquest was awarded. What became of it, I do not know. Perhaps the court, on consideration, decided then what it formally determined later—that it had no jurisdiction. The heirs then living sold and leased parts of it as though it had been divided. Maybe they agreed amongst themselves. In any event, the Act of May 16, 1871, specifically authorized the Warren County Orphans Court to appoint commissioners to make partition on petition of a majority of the heirs. Such a petition was forthcoming, and three Quakers were appointed commissioners on June 10, 1871. It is said that all heirs were represented at the hearing, held in the schoolhouse on August 21. Allotments were made, surveyed and mapped. On December 5 the find-

ings were confirmed by the court. By this action the Grant was divided and everyone seemed satisfied.

"But the Act of 1871 went further. After partition, the owners were permitted to sell only to descendants of Cornplanter or to other Senecas; and the Grant was again declared exempt from taxes or from any judicial sale except to Senecas.

"This created a peculiar title and an interesting problem, both rather thoroughly explored from the state's standpoint after the death of Marsh Pierce, Cornplanter's grandson, on November 3, 1899. Marsh Pierce was in all respects a remarkable man. The Quakers had done well by his education. He was a builder by trade, and a forward-looking citizen. At his death he left five sons: Gibson, Oakley, Amos, Toppley O'Connell, and Windsor. On December 7, 1908, Gibson, the oldest, asked the Warrent County Orphans Court for a partition of the lands amongst the five. On February 13, 1909, the other four alleged that Gibson was not Marsh's son, and the case went to trial. The court appointed a master to take testimony. He interviewed, through an interpreter, some nineteen Indian witnesses, most of them old people. The revelation here of ways of actual Indian life in the middle 1800's makes fascinating reading. The judge found Gibson to be Marsh's son and awarded an inquest to make partition.

"But on June 17, 1911, Amos came into court with a motion to stay proceedings. He contended that the court lacked jurisdiction because all the parties at interest were Indians, not citizens, subject only to the laws of the Seneca Nation, whose quasi-independent existence had been recognized by Congress in 1849; and, besides, that Seneca inheritance is always through the mother's side and white laws do not apply. So the court appointed an auditor to consider all this. Over the following years two more judges heard the case and all decided that their court had authority in the premises, ordering the allotment to proceed. At one point the case went even to the Superior Court. On November 11, 1921, the estate property was sold for $900 to Gibson Pierce, at the courthouse in Warren.

"At this point an Indian lawyer from the Cattaraugus Reservation stepped in and did such a good job that on November 13, 1922—fourteen years after the start—a fourth judge held all proceedings void, and decided that his court had no jurisdiction, mainly on the ground that he doubted its ability to protect the sheriff of Warren County if the Indians resisted him.

"When the federal authorities came to look into this matter in recent years, in connection with the proposed Allegheny Reservoir, or 'Kinzua Dam,' they concluded that 'insofar as the United States was and is concerned, this (Cornplanter) reservation is individual property over which the United States has no jurisdiction.' The basis for this opinion is outlined in House Document No. 300, 76 Congress, First Session, 1939.

"Just where this leaves the Grant legally it is hard to say. But the Indians get along fairly well just the same. Starting with the 1871 partition, they have recognized as heirs all descendants of Chief Cornplanter, whether the descent be through the mothers' or fathers' line. But one dear old lady rather wishes there were someone to whom she

could appeal, because she thinks that a line fence in process of erection is on her land and she cannot find anyone with authority to stop it.

"The Moravian Zeisberger talked religion with the then chief of the Upper Allegheny towns in 1767; and Waterman Baldwin, a teacher, and his Bible were there as early as 1791. But educational and missionary work really started in 1798 with the arrival of three young Quakers from Philadelphia, accompanied by older brethren to set them up in business. Joel Swayne and Halliday Jackson settled down at Old Town, some nine or ten miles above Jennesadaga, where they planned to turn warriors into farmers and artisans. Henry Simmons, Jr., stayed at Jennesadaga with Cornplanter and took over the departments of morals and education. Quakers never prose-

\* \* \* \* \* \*

TRIAL NOTE: At the trial Mr. Merle H. Deardorff—a noted historian—testified on the history of the Cornplanter Tract as outlined in the appendix.

---

## APPENDIX II

### COPY of the Act of Assembly of Pennylvania approved May 16, 1871, P. L. 879:

Preamble.

Whereas, This commonwealth, by an act passed in the year one thousand seven hundred and ninety-one, authorized the governor to grant several tracts of land on the Allegheny river, unto Corn Planter, a friendly Indian Chief, for meritorious services rendered by him to the people of this state:

And whereas, Patents were duly issued to him therefor in fee, and he died intestate, seized of about seven hundred and eighty acres, leaving descendants who have increased in numbers, many of whom have petitioned this legislature for the relief in this act contained; therefore,

Descendants of Corn Planter may petition court for partition of land, &c.

SECTION 1. Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same, That it shall be lawful for a majority of the descendants of Corn Planter, now entitled as his heirs to lands of which he died seized, situated in the county of Warren, in this commonwealth, to present their petition to the orphans' court of said county, thereby praying the said court to cause all said lands to be divided among all the heirs of said Corn Planter, as they may be entitled to share them according to law, and therein to nominate three competent disinterested men, citizens of Pennsylvania, to be appointed by said court, to make such partition and al-

lotment of shares as they may think just and equitable, having regard to value and the location of the improvements made by the parties interested, and to pray also for the appointment of guardians for any parties being minors; and the said three men so appointed by said court, shall have all the powers of commissioners or an inquest to make partition, and shall make the allotments and report their proceedings to said court, and when confirmed by the said court, such partition shall be and remain firm and stable forever.

**Advertisement in case of failure to appear.**

SECTION 2. Should any of the parties interested fail to appear in court by petition, or answer, it shall be lawful for said court to order a citation to issue to such parties as provided by law, in respect to partitions in such court, which may be served within or out of the state, and if such parties are not found, advertisement may be made for them according to law; which services may be made by disinterested persons, and made to appear by affidavit filed of record.

**Owners of purparts may sell to any of the Seneca nation.**

**Alienation to others, prohibited.**

SECTION 3. That after the division of said lands, the owners of the purparts of lawful age, and those under disability by authority of the proper court, may sell and convey their allotments, or any part or parts thereof, to any of the descendants of said Corn Planter, or any member of the Seneca nation of Indians, in fee, who shall hold the granted lands subject to this act; but none of such lands shall be aliened or devised to others than such descendants or members of the Seneca nation of Indians, without the authority of the legislature first had therefor, nor shall such lands, which held by the descendants of Corn Planter, or members of the Seneca nation of Indians, be liable to taxation, to the lien of any judgment, mortgage or claim, or to any execution, or to any judicial sale, except to descendants of Corn Planter, or to members of the Seneca nation of Indians as aforesaid.

James H. Webb,
Speaker of the House of Representatives.

William A. Wallace,
Speaker of the Senate.