UNITED STATES of America,
Plaintiff,

v.

**CERTAIN PARCELS OF LAND** Situate **IN CATTARAUGUS COUNTY, STATE OF NEW YORK**, and the Seneca Nation of Indians, a body corporate, et al., Defendants.

Civ. 10433, Tr. 3104–E; Civ. 10434, Tr. 2900–E; Civ. 10435, Trs. 2711–E, 2736–E, 2742–E; Civ. 10496, Tr. 2808–E; Civ. 10616, Tr. 2744–E; Civ. 10662, Trs. 2709–E, 2775–E, 2776–E, 2777–E, 2778–E; Civ. 10668, Trs. 3211–E, 3254–E; Civ. 10699, Trs. 3046–E, 3052–E; Civ. 10726, Trs. 2732–E, 2740–E; Civ. 10751, Trs. 2800–E; Civ. 10764, Tr. 2842–E; Civ. 10779, Trs. 2727–E, 2731–E; Civ. 10784, Trs. 2700–E, 2784–E, 2785–E, 2788–E; Civ. 10792, Trs. 2720–E, 2933–E.

United States District Court,
W. D. New York.

Feb. 10, 1970.

H. Kenneth Schroeder, Jr., U. S. Atty. (C. Donald O'Connor, Asst. U. S. Atty., Buffalo, N. Y., of counsel), for the United States.

Congdon, Congdon & Perreault, Salamanca, N. Y., for defendants; (Benjamin C. Perreault, Salamanca, N. Y., of counsel).

JOHN O. HENDERSON, Chief Judge.

This action in condemnation was instituted on behalf of the government by filing complaints in this court to acquire title to easements and interests in land for use in conjunction with the construction, operation and maintenance of the Allegheny River Reservoir Project. This project, also known as the Kinzua Dam Project, was authorized for the purpose of flood control pursuant to the Flood Control Acts of June 22, 1936 (49 Stat. 1570), June 28, 1938 (52 Stat. 1215) and August 18, 1941 (55 Stat. 638) and affects by taking some 10,000 acres of land in New York State within the Allegany Indian Reservation of the Seneca Nation of Indians. The dam site is located on the Allegheny River in Warren County, Pennsylvania, and the reservoir is located in Warren and McKean Counties, Pennsylvania, and Cattaraugus County, New York. The reservoir, together with the flowage easement areas, extends from the dam site at Kinzua, Pennsylvania, to near Salamanca, New York, a distance of approximately thirty-five miles. This action involves thirty-nine tracts, consisting of less than 1400 acres. An interest was appropriated in the entire tract for twenty-nine tracts, and for the other ten tracts an interest was appropriated in less than the whole.

The court appointed a commission of three men to determine just compensation. The commission spent approximately twenty-six days hearing proof and in excess of 290 exhibits were received in evidence. The transcript of the hearings was taken and comprises approximately 4000 pages in thirty-eight volumes. The report filed by the commission is 228 pages in length and, in addition, in an appendix summarizes the comparable sales considered by the commission in determining value. Pursuant to the instructions of this court in establishing the commission, the report contains two sets of conclusions concerning the value of just compensation for the defendant landowners' interests in lands which were appropriated, that is, one reached without consideration of the tax-exempt status of the land in the hands of the Indians, and the other reached after taking the tax-exempt status into consideration.

The evidence before the commission consisted primarily of expert opinion concerning the value of the subject tracts according to the expert's conclusions regarding the highest and best use of the land appropriated. As could be expected, the valuation of the experts differed sharply. The expert for the defendant landowners, Russell Lane, testified generally that the damages caused by the appropriation of the thirty-nine tracts amounted to $615,000, without consideration of the tax-exempt status, and $1,194,000 considering the tax-exempt status. The government, on the other hand, through its experts, introduced testimony that the total damages were $102,060, and that no consideration should be given to the tax exemption. The commission, threading its way between these extremes, found the actual damages to be $386,825 without considering the tax-exempt status, and $595,690 considering the exemption. That conclusion is approximately 63% of the landowners' expert's testimony without considering the tax-exempt status, and about 50% of the valuation which he gave considering the exemption. The commission's report specifically categorized its findings as to land, dwelling houses, and other improvements. Considering land only, the commission's conclusions amount to an average award of $256 per acre without considering the exemptions and $397 per acre considering the tax-exempt status of the Indians.

The government filed objections to the report filed by the commission. The objections are extensive under nine main headings, with some headings containing many subdivisions and many subdivi-

sions containing a number of sub-subdivisions. On the basis of these objections, the government's prayer is that the court reject the awards in toto, order new trials, and deny the defendants any compensation for tax benefits. The defendants have moved to approve the report of the commission and have petitioned further that the court adopt the commission's findings and consider the tax-exempt status of the real property.

██ The government first alleges that it was error to have referred this matter to a commission. If this be error, the government has made the most of it. The objection, of course, has been previously overruled, and this court has, in the exercise of discretion, referred the issue of just compensation to a commission for reasons set forth in United States v. Hall, 274 F.2d 856 (9th Cir. 1960), cert. denied, 362 U.S. 990, 80 S. Ct. 1077, 4 L.Ed.2d 1022 (1960), particularly because of the impossibility of trying the issues before one jury and, additionally, because the appointment of a commission would result in more uniformity of awards.

██ The court, having referred the issue to a commission, is bound to accept the findings of that commission unless clearly erroneous. Federal Rules of Civil Procedure, Rule 71A(h) and Rule 53 (e) (2). Where the findings are based on sharply conflicting evidence, those findings are conclusively binding on a district court and cannot be set aside in whole or in part unless clear error has been made. Wilson v. United States, 350 F.2d 901 (10th Cir. 1965). Here, as outlined above, the commission had before it divergent expert opinion concerning the value of the land. They chose to give greater weight to the expert for the defendants than they did to the government's witnesses. This was entirely within their province in determining the issues presented to them. Stephens v. United States, 235 F.2d 467 (5th Cir. 1956). The court has reviewed the testimony of Russell Lane, including his qualifications, and finds him to be qualified to express expert opinion on the matters which were covered in his testimony regarding these tracts of land.[1] Reliance on his testimony cannot be fashioned as clear error. The commission's findings, made in reliance upon the testimony both as to the highest and best use of land and to the market value of such land considering the highest and best use, are supported by substantial evidence, and the court accepts those findings. United States v. Benning, 330 F.2d 527, 531–533 (9th Cir. 1964). The objections raised by the government concerning these matters are attempts to relitigate in this court factual questions which have been determined by the commission who saw and heard the witnesses and are in the best position to deter-

---

[1]. In this connection, the court has also considered the alleged errors in Lane's testimony, as outlined in the brief of the government at pages 1 through 17 of the appendix and as rebutted in defendants' brief at pages 59 through 61, and finds them to be insufficient in law and in fact to require this court to disregard that testimony as a matter of law. The discrepancies for the most part are minor and unsubstantial, and result from rounding figures or referring to various exhibits which themselves contained some inconsistencies. Some errors are typographical. The expert's opinion in this case could hardly be expected to be free from error, considering the amount of testimony he gave.

The court has examined the claims of the government that Mr. Lane was not qualified to express opinions on timber or soil values, and that it was error to consider these values in arriving at the market value of the land. The commission heard the testimony of Lane regarding timber values, including his qualifications to give such testimony. The government did not take exception to his qualifications before the commission and, therefore, it was not error to receive the evidence. The weight to be given to such testimony, having received it, was entirely up to the commission. The court finds no legal impediment regarding the "unit rule" which prevented the commission from considering, as a part of the total market value of the property, the value of the timber or soil situated on it, especially since the government introduced no evidence on its own behalf concerning timber value.

mine issues of credibility and the weight to be accorded to testimony.

The report of the commission in general made specific findings as to each tract, the proof presented on each side concerning that tract, the findings as to the highest and best use, the evidence it was relying upon in reaching those findings, and recited specific figures as to fair market value before the taking, after the taking, and the amount proportioned to land, dwelling houses, or other improvements. The commission also specifically found the values, considering the tax-exempt status, by a capitalization method which the commission thought accurately reflected in dollars the value of the property to a tax-exempt owner, by adding to the market value the equivalent financial return to him.[2] In so doing, the commission clearly marked the path they followed in reaching their determinations, as they are required to do, United States v. Merz, 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629 (1964) and, because the path is marked, the report is not inadequate for judicial review as is claimed by the government.

The commission's findings in almost all instances are within the middle ground between the opinions rendered by the experts for each side. In those cases where the after values of the property are not within the range of opinions received in testimony, the discrepancy can be explained by noting that the commission viewed the property in question and may have arrived at higher after values on the basis of their personal observations, or on the location of the property geographically as indicated by the maps which were received in evidence. A commission or court is not bound to make findings only within the area outlined by the testimony, but may find the facts to be otherwise if persuaded by the evidence. In certain instances, the commission did so. It was

not necessary to detail extensively their reasons for arriving at that conclusion.

The findings of the commission as to the value of the land are not excessive as claimed by the government. Considering the tax-free status, the average value per acre is $397, and this is comparable to the results reached in United States v. 205.03 Acres of Land, etc. (Cornplanter case), 251 F.Supp. 858 (W.D.Pa.1966) which involved the taking of four parcels of Indian property which was also tax exempt. The case was tried before a jury whose verdict awarded lower damages per acre for two of the parcels and higher damages than here for the remaining two parcels. The awards in the Cornplanter case were approximately five times the damage testified to by the government's expert witness. The awards here are 5.84 times the government's expert testimony, considering the tax-exempt status.

The court has attempted to answer the main thrust of the objections made by the government to the commission's report. Other objections, in the main, result from a firmly held view on behalf of the government that the commission erred in considering the testimony of the defendant landowners' witness, and consequently that the facts as the commission found them to be are erroneous. No matter how firm the government may be in that belief and irrespective of the fact that it may be held in the utmost good faith, the disagreement with the factual conclusions of the commission does not furnish a legal basis for setting aside the commission's report. Such factual opinions were resolved before the commission and cannot be reconsidered here.

The court must now turn to the question of the consideration which should be given to the tax-exempt status of the land while the title thereto remained in the hands of the Indians. As long as

2. The commission used the following as a fair rate of return: Land 5%; resident improvements 6%; commercial improvements 10%. These rates were found by the commission to be normal and reasonable rates of return, a finding which was proper.

they held the land, they were not required to pay real property taxes. New York Indian Law, McKinney's Consol. Laws, c. 26, § 6, New York Real Property Tax Law, McKinney's Consol.Laws, c. 50–A, § 454. This tax-exempt feature remained even where the land was leased to non-Indians. Consequently, if leased, the Indian lessor would receive the rent without the expense of real property taxes. The court's instructions to the commission on the question of the tax-exempt status provided:

"In determining fair market value, you are to consider the extent to which the property, including improvements, is exempt from taxation. Your award of just compensation should consider the additional fair market value of the property above the fair market value such property would have had if subjected to taxation. However, to the extent that your award may include an amount of money attrubutable to such tax-exempt status, that amount shall be segregated and labeled as such. In other words, your award will reflect both (1) market value of the property without consideration of the tax-exempt status and (2) the market value of the property taking into consideration the tax-exempt status."

In reliance upon and in conformity with these instructions, the commission found two values for each tract. The government urges (1) that the tax-exempt status should not be considered and (2) even if it is considered, this was not properly done by the commission because they did not take into consideration the restraint upon alienation which goes hand in hand with the tax-exempt status of the land held by the Indians. New York Indian Law § 6. The government relies on certain language set forth in St. Lawrence Seaway Development Corporation v. 8.51 Acres of Land, etc., Civil 6846 (unreported decision Northern District of New York) as follows:

"The general principles of law which must serve as a guide for the

ultimate determination to be made are not in serious dispute. The legal concept of market value for the highest and best use of the property condemned is the generally accepted measure of just compensation. United States v. Miller, 317 U.S. 369 at 374 [63 S.Ct. 276, 87 L.Ed. 336]. This rule is not inflexible or 'autocratically absolute.' State of Nebraska v. United States, 164 F.2d 866 at 869. There would seem to be no reason to depart from the above concept in ascertaining just compensation here. The fact that the lands involved could not be sold or leased without authorization from the state does not preclude the application of the fair market theory. *Neither is the value of the land affected by the fact that, when taken, it was tax exempt.* Westchester Co. Park Commission v. United States, [2 Cir.] 143 F.2d 688. Special adaptability of lands for a particular use may only be considered when there is a reasonable probability that such lands or combination of lands will be so used in the reasonably near future. United States ex rel. T.V.A. v. Powelson, 319 U.S. 266 at 275 [63 S.Ct. 1047, 87 L.Ed. 1390]; Olson v. United States, 292 U.S. 246 at 257 [54 S.Ct. 704, 78 L.Ed. 1236]. This principle is expressed in the following quotation taken from Matter of City of Rochester, 234 A.D. [App.Div.] 583 at 586 [255 N.Y.S. 80]—'Care must be taken however not to substitute for reality the mere hope of the owner that the property might be used for some specific purpose.' Another rule, not seriously urged here, is to the effect that if the burden imposed upon lands here was within the probable scope of the Seaway project, then the owner may not obtain the benefit of an increase in value resulting therefrom. United States v. Miller, *supra*, [317 U.S.] at 377 [63 S.Ct. 276]." [Emphasis added.]

The Indian landowners rely on United States v. 205.03 Acres of Land, etc.,

*supra* (Cornplanter case) where the district court stated:

"The concept of fair market value in its usual sense cannot be applied to the land held by these Indians. That rule presupposes a willing seller and a willing buyer with the value being fixed by reference to comparable sales of similar lands in the vicinity. But that set of circumstances has not existed in the whole history of the Cornplanter grant. Under the evidence the jury determined just compensation based on the fact that Indians owned these lands under the Pennsylvania statute with all its benefits and restrictions. * * * The market value test is not applied in all cases.

"This has been recognized by the Supreme Court in many instances, notably—Montana Railway Co. v. Warren, 137 U.S. 348, 11 S.Ct. 96, 34 L.Ed. 681 (1890), and reiterated again in a full discussion of the subject in United States v. Miller, 317 U.S. 369, 63 S. Ct. 276, 87 L.Ed. 336 (1943). These lands had no market in the usual sense and, therefore, resort to the best data available to ascertain just compensation was used. This is permissible under the Miller decision, and see also Hanson Lumber Co. v. United States, 261 U.S. 581, 43 S.Ct. 442, 67 L.Ed. 809 (1923); and Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463 (1893) * * * In this case it seems to me that the Indians are entitled to have the land considered by the Jury with all its benefits and all its restrictions. It is land like no other land privately owned so far as this Court is able to determine. But for the

Kinzua Dam the Indians owning this property would own it in perpetuity free from taxation. This status was granted by the State of Pennsylvania. Although these are private lands, the Indian owners are wards of the nation and not of the states, but the federal government has never relinquished its suzerainty over them. See Tuscarora Nation of Indians v. Power Authority, 257 F.2d 885 (2d Cir.) * * * It appears from the briefs of counsel and their research on this subject that but little authority has been uncovered, but what has been cited seems to favor the ruling (Judge Willson's ruling permitting the Jury to consider the tax free status as an element of value) made during the course of these trials. For instance, 4 Nichols, Eminent Domain, § 12.32, p. 224, states that the owner is entitled to the added value which the tax exempt status gives to his property. To the same effect is Orgel, Valuation Under the Law of Eminent Domain (1953), § 45, p. 215. Both the textbook writers seem to base their authority on the Massachusetts decision—Old South Association in Boston v. City of Boston, which holds that the tax exempt status of the land adds to the value thereof. This decision was handed down in 1912 by the Supreme Court of Massachusetts, 212 Mass. 299, 99 N.E. 235."

 This court is of the opinion that in this case the standard of just compensation cannot be measured by fair market value alone. Indians, who have lost their land by the government taking and are reimbursed for the market value alone, have not been made whole, since thereafter they do not own lands which are free from taxation.[3] Anyone who

---

3. This is strikingly demonstrated in the following passage of the defendants' brief: "For example, Franklin John, defendant in respect to Parcel No. 2740, owned and operated a dairy farm on the appropriated premises. For many years he paid no taxes and thus received additional benefit from his reservation lands. After the condemnation he was forced to acquire land off the reservation on which he pays taxes.

While the soils and size of the replacement property were different, assuming for the sake of argument the same milk production, it is impossible to deny that his financial return from the land has been decreased by the taxes which he pays, and it is fruitless to argue that he has been given just compensation if the tax exempt status of his land is not considered."

owns property cannot seriously dispute that if he was not required to pay taxes and the property was taken from him, "just compensation" would only be made if allowances were awarded considering the exemption. Fair market value, determined by a willing buyer and a willing seller, would not reflect that status, since the privilege of being exempt from taxes is not transferable. In such situations, it is the loss to the Indian—not the gain to the purchaser—which the just compensation must reflect. The concept of fair market value, therefore, as traditionally used, does not reflect the owner's loss. United States v. 205.03 Acres of Land, etc., *supra*. The method used by the commission, by calculating the equivalent of a financial return to the owner by the capitalization method utilized, did reflect that loss in a manner designed to render just compensation to the Indian landowners. Nichols on Eminent Domain §§ 12.32 and 14.248 and Orgel on Valuation Under Eminent Domain § 45. The court finds that the tax-exempt status must be considered [4] to render just compensation, and that the method used by the commission resulted in a figure which compensates for the loss of the exempt status.

■ Even assuming the tax-exempt status should be considered, the government further urges that the commission erred in failing to take into account the restraint on alienation. The government claims that the court's instructions (p. 19) to the commission, to the effect that the restraint on alienation should not be taken as meaning that the Indians' interest is less than fee simple title, failed to give the government an opportunity to dwell on what it considers to be the undesirable and totally offsetting restraints on alienation. The instructions to the commission did not have this effect. They did not operate to prevent the government from introducing proof that the tax-exempt status should be discounted [5] by some standard to reflect the restraint on alienation. The government, however, as noted by the commission, "treated the property as if it was not tax exempt and made no offer of any proof whatsoever with regard to any market value taking into consideration the tax-exempt status." (Commission Report, p. 19). Therefore, if the amounts attributed to the tax-exempt status by the commission fail to take into account the devaluing factor of the restraint on alienation, that omission has resulted from the government's failure to introduce proof on the subject. The commission clearly found the amount attributable to the tax-exempt status on the basis of the evidence introduced before it, and the record indicates its conclusions are supported.

The court has examined the report of the commission, adopts its findings, and confirms that report considering the tax-exempt status of the Indian landowners. The court overrules all objections thereto raised by the government.

It is so ordered.

---

4. Westchester County Park Commission v. United States, 143 F.2d 688 (2d Cir. 1944) does not conflict with this conclusion, since in that case the property when condemned was owned by a county exempt from real property taxes and not engaged in residential or commercial land uses common to individual landowners.

5. This is assuming that the restraint is detrimental. The same restraint immunizes the land from the claims of creditors. The restraint is also limited, since the Indians are free to sell it outright to other Seneca Indians.