**UNITED STATES of America, Plaintiff,**

v.

**14,003.49 ACRES OF LAND, MORE OR LESS, SITUATED IN the COUNTY OF LEELANAU, STATE OF MICHIGAN, and Security Trust Company, et al., and Unknown Owners, Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**225.89 ACRES OF LAND, MORE OR LESS, SITUATED IN the COUNTY OF LEELANAU, STATE OF MICHIGAN, and Detroit Bank and Trust Company, Trustee, et al., and Unknown Owners, Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**189.99 ACRES OF LAND, MORE OR LESS, SITUATED IN LEELANAU COUNTY, MICHIGAN, Detroit Bank and Trust Company, Trustee, et al., and Unknown Owners, Defendants.**

Nos. G78–153 C.A., G78–216 C.A. and G78–217 C.A.

United States District Court,
W.D. Michigan, S.D.

Sept. 16, 1983.

Reconsideration Denied Nov. 23, 1983.

Marvin Schneck, Dept. of Justice, Washington, D.C., Donald Daniels, Asst. U.S. Atty., Grand Rapids, Mich., for plaintiff.

Dale W. Rhoades, Grand Rapids, Mich., for defendants.

## OPINION

NOEL P. FOX, Senior District Judge.

### INTRODUCTION

Presently before the court is the second commission report in this lengthy condemnation action. The first commission report was filed in May 1979, following extensive hearings held in 1978. Two commissioners joined in the report, which recommended just compensation of $6,454,799. The third commissioner filed a separate dissenting opinion recommending a higher, but unspecified, amount.

In May 1980, this court remanded the matter to the commission, primarily to consider whether recent significant changes in the market for cherry production lands had resulted in a new higher and best use for the interior portion of this 14,000 acre is-

land. The latest commission report, following extensive hearings in 1980, recommends just compensation of $9,205,099. Again, one of the three commissioners has dissented, recommending just compensation of $19,180,390. Plaintiff United States accepts the majority report as being error-free, although suggesting that a lower value could have been reached based on the evidence. The defendant landowners argue that the majority report is clearly erroneous throughout, and that it should therefore be rejected in favor of the minority report.

This action has been particularly complex because it involves essentially three separate "properties." The parties agree that the island includes 97,000 feet of prime beach frontage (including the frontage on Lake Manitou, an inland lake), and another 25,000 front feet of bluff frontage. It is agreed that the highest and best use of this frontage, to a depth of 1320 feet, is for recreational and second home development. Although the front footage values are greatly disputed, it is agreed that the bluff frontage is worth one-half the value per front foot of the prime footage.

The second "property" is timber. The parties agree that the island contains approximately 57 million board feet of merchantable timber. There is little dispute as to species or size distribution. It is also generally accepted that, given the state of the timber on the island, its highest and best use is not for management for sustained yield, but rather it should be valued based on the amount of economically removable merchantable timber extant on the island as of the date of trial. Major points of dispute include the quality of the timber, its market value, the amount that can be removed given economic (and perhaps aesthetic) constraints, and whether to discount the value of standing timber which will be harvested over a number of years.

The third distinguishable "property" is the 10,083 acres of interior land. The highest and best use of this land is in dispute. The government argued, and the commission majority found, that its highest and best use is for recreational development.

In 1978 the landowners also considered this the highest and best use. The landowners argued in 1980, and the dissenting commissioner determined, that the highest and best use of the interior land was agricultural land used for cherry production. It is accepted by all that cherries can be grown on the island. At issue is whether the cherries grown on the island could compete in the marketplace with mainland-grown cherries.

There is a fourth "property" which neither commission report suggests should be compensated for. This is industrial sand deposits found on the southern end of the island. The landowners argued strongly in 1978 that the sand had value which they should be compensated for. This was not a major issue in the 1980 hearings, and in their Supplement to Defendant's Objections to Preliminary Report (Majority), the landowners argue that sand was not a component of value in their 1980 analysis of just compensation.

Since the commission reports have been filed, the court has received and reviewed numerous briefs and has heard two days of final argument.

APPLICABLE LAW

The law governing condemnation actions is quite straightforward. "Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined." *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934). The landowners are entitled to that value of their land which it would have if put to its highest and best use. *Cf. Id.* ("highest and most profitable use"). This action is somewhat unusual in that it is clear that the landowners have not in the past been particularly interested in putting the island to its highest and best use, *i.e.,* they have not been managing it with an eye towards profits. Nonetheless, they are entitled to whatever the island is worth if put to its highest and best use and are essentially free to suggest whatever highest and best use they believe the evidence will support.

Condemnation actions are governed by Fed.R.Civ.P. 71A. Rule 71A(h) provides

that where a commission is appointed to determine just compensation, its report shall be determined by a majority and shall be dealt with by the court in accordance with the practice prescribed for reports of masters in Fed.R.Civ.P. 53(e)(2). That rule provides in relevant part, "the court shall accept the master's findings of fact unless clearly erroneous." This rule's application to condemnation cases was discussed by the Supreme Court in *United States v. Merz,* 376 U.S. 192, 198–199, 84 S.Ct. 639, 643–644, 11 L.Ed.2d 629 (1964):

> Since by Rule 71A(h) the report has the effect of a master's findings of fact under Rule 53(e)(2), the commission should be instructed as to what kind of findings should be included. Conclusory findings are alone not sufficient, for the commission's findings shall be accepted by the court "unless clearly erroneous" . . . . The commissioners need not make detailed findings such as judges do who try a case without a jury . . . . The path followed by the commissioners in reaching the amount of the award can, however, be distinctly marked. Such a requirement is within the competence of laymen; and laymen, like judges, will give more careful consideration to the problem if they are required to state not only the end result of their inquiry, but the process by which they reached it.

(Footnotes omitted.)

As explained in Wright & Miller, Federal Practice and Procedure, § 2614:

> The "clearly erroneous" standard here applied is exactly the same as the standard governing the review by a court of appeals of findings of fact by a district court . . . . The findings of the master come with a strong presumption of validity but they are not given the effect of a verdict of a jury. The parties are entitled to a real review by the court to determine whether the findings were clearly erroneous. A finding by the master is clearly erroneous when, although there is evidence to support it, the court on the entire evidence is left with the definite and firm conviction that a mistake has been made. In the application

of that principle, due regard must be given to the opportunity of the master to judge the credibility of the witnesses. A finding may be set aside even though it is supported by substantial evidence if the court is convinced that it is clearly wrong. At the same time a finding must stand, even though the court thinks it is against the preponderance of the evidence, if the court does not consider it clearly erroneous.

■ A finding is clearly erroneous when based upon misapplication of the law, unsupported by the evidence, or contrary to the clear weight of the evidence. *United States v. 79.95 Acres of Land,* 459 F.2d 185, 187 (10th Cir.1972). A reviewing court cannot reweigh the evidence, retry the facts or substitute its judgment of value for that of the fact finder. *United States v. 2,635.04 Acres of Land,* 336 F.2d 646, 649 (6th Cir. 1964); *United States v. 416.81 Acres of Land,* 525 F.2d 450, 454–455 (7th Cir.1975).

■ Where findings are based on sharply conflicting evidence, such findings are conclusively binding on a district court and cannot be set aside unless clear error has been made. *Wilson v. United States,* 350 F.2d 901 (10th Cir.1965); *United States v. Certain Parcels of Land in Cattaraugus County, New York,* 327 F.Supp. 181 (W.D. N.Y.), *aff'd,* 443 F.2d 375 (2d Cir.1970).

■ Commissioners are not required to explain exact thought processes they use nor are they required to use a mathematical model which can be reviewed by the district court like an alegbraic equation. *United States v. 573.88 Acres of Land,* 531 F.2d 847, 849 (7th Cir.1976); *Chandler v. United States,* 372 F.2d 276 (10th Cir.1967).

■ In reviewing the findings of a master, the trial court may adopt the master's report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions. *Cold Metal Process Co. v. United Engineering & Foundry Co.,* 132 F.Supp. 597 (1955), *aff'd,* 235 F.2d 224 (3rd Cir.1956).

Initially the court notes two minor clear errors in the commission report. The value of improvements on the subject parcel as stipulated to by the parties is $249,990, not $249,999 as used by the commission. And the commission misadded the contributing values. After correcting these errors, the court starts its analysis based on a commission recommendation of $9,215,090.

## HIGHEST AND BEST USE OF THE INTERIOR

This is perhaps the most important issue presently before the court, since the highest and best use of the interior also has an impact on the other aspects of value, especially timber. In 1978 both parties agreed that the highest and best use of the interior of North Manitou Island was recreational use. As a result of sharply rising prices for lands suitable for cherry production in the late 1970s, the landowners requested this matter be remanded to the commission so that the commission could determine whether the highest and best use of the interior had changed. Following extensive and often contradictory testimony regarding the feasibility of cherry production, the commission has decided that the highest and best use has not changed, and that the landowners' cherry production proposal is too speculative.

Landowners now challenge the commission's failure to adopt the proposed cherry production analysis of highest and best use. Landowners allege three major errors, and numerous other errors: (1) the government's analysis hinges on future agricultural prices; (2) the government's pricing study was improperly done, primarily due to errors in discounting, and (3) assuming the highest and best use is recreational use, the commission's value is too low.

The standard for establishing the highest and best use is fairly high, although few cases have dealt with this particular issue. In *Olson v. United States,* 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934), the Court stated:

The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. . . . [T]o the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account.

. . . Elements affecting value that depend upon events or combinations of occurrences which within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.

. . . "The inquiry in such cases must be what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted."

292 U.S. at 255–258, 54 S.Ct. at 708–709, *quoting from Mississippi & Rum River Boom Co. v. Patterson,* 98 U.S. 403, 407, 25 L.Ed. 206 (1879).

In *United States v. 320.0 Acres of Land,* 605 F.2d 762, 814 (5th Cir.1979), the court stated: "The principle that just compensation cannot be predicated upon potential uses which are speculative and conjectural is of course firmly established." *See also United States v. Whitehurst,* 337 F.2d 765, 771 (4th Cir.1964); *United States v. Cooper,* 277 F.2d 857, 859–860 (5th Cir.1960). Perhaps the best summary of the standard is the following, contained in "Additions to Instructions to the Commissioners on the Law," filed in this action, at P. 4:

A developmental approach to determination of just compensation may be admitted into evidence at the discretion of the commission so long as a proper foundation is laid for such opinion testimony. Assuming the testimony demonstrates: (a) *the existence of a potential use which*

*does not require the expenditure of substantial capital,* (b) the development is not of a highly uncertain project, (c) *the development is not highly speculative in and of itself,* (d) the property is physically adaptable to the proposed use and (e) *a market in fact exists on the date of taking or would be reasonably likely to exist in the near future for the proposed use;* then opinions of value based on such proposed use are appropriate and admissible. (Emphasis added.)

The landowners' position in 1978 was that the highest and best use of the interior was for recreational use. On remand landowners have a significant burden in attempting to support such a novel use as cherry production. The essence of the commission report is that the landowners have not carried that burden, *i.e.,* they have not taken their proposal out of the realm of speculation.

Landowners' first two major alleged errors and most of their other alleged errors are directed at the government's analysis, suggesting it is filled with error. But the commission's conclusion relies very little on the government's analysis; rather, it stresses the speculative and uncertain nature of the landowners' whole scheme, its inherent risk, and the very substantial capital investment required ($100 million). As such, even assuming the government's analysis improperly relies on future agricultural prices or improper analysis of risk, it cannot be said that the commission's analysis relies on these factors. There is sufficient evidence to support the commission findings relative to speculation, risk and high capital requirements.

In reference to economic feasibility as argued by both parties, there is sufficient evidence to negate any possible finding of clear error in the commission's *implicit* finding that the extra costs involved in operating on North Manitou Island would more than offset the alleged high quality of the land and any benefits gained by economies of scale.

One other argument deserves comment. Landowners object strenuously to commission statements concerning the difficulty of finding willing purchasers. Contrary to landowners' position, the court does not read these statements as violating its instructions regarding the assumption that there are willing and financially able purchasers. Any such instructions are not intended to take from the commission the decision that a proposed use is so speculative, uncertain or risky that no reasonably prudent investor would be willing to invest in it.

■ Thus it appears that there was certainly sufficient evidence before the commission to support its decision on the highest and best use of the interior portion of the island. And the decision is well within the parameters established by this court's instructions. Landowners have not shown the commission's analysis to be clearly erroneous. This holds true, as well, for the valuation of the interior for recreational uses. Landowners have not shown that the $200/acre value determined by the commission is clearly erroneous. Accordingly, I affirm the commission's contributory value of the interior portion of the island of $2,016,600 (10,083 acres × $200/acre).

## FRONTAGE

The commission has determined just compensation for the island frontage, a ring 1320 feet deep around the island itself and around Lake Manitou in the interior, of $45/front foot (f.f.) for beach frontage and $22.50/f.f. for bluff frontage. The dissent, based on essentially the same comparables, determined just compensation of $64/f.f. and $32/f.f., respectively. In a recent related condemnation action also involving frontage on North Manitou Island, and relying on many of the same comparables, I determined just compensation of $140/f.f., retail, for Lake Michigan beach frontage, and $60/f.f., wholesale, for frontage on Lake Manitou. *United States v. 61.60 Acres of Land* (Fiske), G78–490 C.A. (opinion dated 7/6/81), *app. voluntarily dismissed,* No. 82–1054 (6th Cir. 4–27–82).

Landowners allege two major errors in the commission report: (1) excessive discounting for size, and (2) failure to use a 1969 sale (Stanz) as a comparable sale. Given the numerous more recent comparable sales upon which the commission relied, it cannot be said that failure to update and use the 10-year old Stanz sale is clear error. The first issue is much more troublesome, however.

Throughout both the 1979 and 1980 hearings, the experts have generally used a 2.5:1 or 3:1 ratio for converting retail prices to wholesale prices. This is necessary because many of the comparable sales being utilized are retail sales, and it is understood by all that the value of North Manitou Island is to be determined at wholesale.

In the second round of hearings government appraisers for the first time suggested that greater ratio should be used for larger wholesale parcels, such as North Manitou Island. The landowners suggest that the government's analysis was two-step; one adjustment from retail to small wholesale—a second adjustment from small wholesale to large wholesale. The landowners refer to this as a "second size adjustment." The government claims there is no second size adjustment, that only one adjustment is being made. The larger reduction from retail to wholesale for especially large parcels, the government argues, is simply a reflection of higher holding costs, *i.e.,* very large parcels take significantly longer to develop and sell, thus increasing holding costs, and reducing present value.

The commission apparently used the larger ratio, although it does not specify what ratio it used. The following passage from the commission report indicates that a ratio higher than the usual 2.5:1 was used by the commission.

The best property on Beaver (Green's Bay) sold at a rate of $71 per front foot [5500 front feet, wholesale] and, when adjusted for the obvious extreme difference in size, would not exceed $35–36 per front foot.

After allowing for time, location, size and amenities it would appear that a price of $45 per front foot is fair market value for North Manitou's prime frontage. In making this judgment, the Commission has conceded that North Manitou is at least equal to Beaver Island and better than South Fox Island in its location, terrain and development potential. The Commission finds that North Manitou's much larger size is its major negative attribute in applying the comparable prices from South Fox and Beaver.

Where the highest prices obtainable at wholesale on Beaver are approximately equal to Mr. Walsh's [landowners' expert] appraisal of frontage on North Manitou, it is clear that he has failed to make enough adjustment for the magnitude of the acreage and frontage offered for sale on North Manitou. It is the Commission's conclusion that the appropriate adjustment for size alone from Beaver comparables would be in a range of one third to one half and this would justify no more than the figure of $45 per front foot for North Manitou.

Preliminary Report of Commission, pp. 12–13 (footnote omitted). Most of the Beaver Island comparables referred to above were already wholesale. The quoted passage indicates that the commission has applied a reduction in converting these small wholesale front footage prices to the large wholesale unit which is North Manitou Island.

█ I find this adjustment unsupported by the record, and clearly erroneous. In so ruling, I note that the commission considered size to be a positive attribute in its 1978 report. In addition there appears to be little market evidence to support the larger reduction. More to the point, perhaps, is the fact that none of the experts even suggested the larger ratio in 1978, and the government's own expert applied only a 3:1 ratio in analyzing sales of up to 36,000 acres.

The large amount of property over which development costs (dock roads, utilities, etc.) can be spread suggests that size is a plus factor, especially, as here, where the

purchaser would initially control essentially the whole island. Accordingly, I find the higher ratio is clearly erroneous.

If the several wholesale comparables from Beaver Island are accepted as legitimate wholesale prices, they suggest, as the dissent found, a wholesale price of approximately $60/f.f. And it appears from the above-quoted portion of the commission report that the major difference between the Beaver comparables and North Manitou Island, in the commission's eyes, was size. If the size factor is not relevant, as I have determined above, the commission analysis appears to suggest a value of approximately $60/f.f.

In the *Fiske* action I determined just compensation for Lake Michigan beach frontage of $140/f.f., retail. Translating that to a wholesale value using the 2.5:1 ratio results in a wholesale price of $56/f.f. In the same action, frontage on Lake Manitou was valued at $60/f.f., wholesale.

I find the proper wholesale frontage value in the instant action to be $60/f.f. This is grounded on three items: (1) the *Fiske* analysis outlined above, which was based on many of the same comparables, (2) the dissent's analysis in the instant action recommending $64/f.f., and (3) the commission's value of $45/f.f. corrected by backing out the excessive reduction for size, as discussed above. Based on the $60/f.f. value for beach frontage, bluff frontage is valued at $30/f.f. This results in a contributory value for frontage of $6,570,000 ((97,000 f.f. × $60/f.f.) + (25,000 f.f. × $30/f.f.)).

## TIMBER

In the area of timber, I find that with one exception, the commission's analysis is not clearly erroneous. This area has been particularly difficult to review since the commission did not directly accept the analysis of either party. The government's analysis was based on the assumption that the only marketable timber on the island was all logs in veneer trees of 18" and higher diameter breast height (dbh) and all veneer logs in the 14" and 16" dbh classes. Trees in the 12" dbh class and the number 2 and 3 logs in veneer trees in the 14" and 16" dbh classes were not considered eco-

nomically removable, based on the inability of local mills and local markets to economically absorb sufficient quantities of these lower value products. The record contains sufficient information to support the commission's rejection of the government's position that much of the timber was not economically marketable.

Similarly, the commission rejected the landowners' analysis which was based on the harvesting of all trees 12" dbh and greater, which could be economically removed from the island. There is sufficient evidence to support the commission's finding that removing all economically removable timber over 12" dbh would have a significant adverse affect on the residual value of the island for later uses.

Because the commission found neither analysis acceptable, it adopted its own analysis, based in large part on a recent timber purchase on Beaver Island. This purchase was discussed at length by both parties' experts.

There is general agreement as to the amount and type of timber on North Manitou Island. Landowners have raised three major sources of possible error in the commission report: (1) the commission erred in reducing the amount of timber which could be removed from the island by 40 percent, for aesthetic purposes, (2) the commission erred in discounting by 12 percent annually the value of standing timber which would be harvested over a period of years, and (3) the commission erred in determining stumpage prices, by adopting a price which failed to properly reflect the high quality of timber on North Manitou Island.

The first challenged finding turns in large part on the highest and best use to which the interior portion of the island will be put. If clearcutting followed by cherry production is the basis of the analysis, clearly there would be no reason to harvest less than the total amount of economically removable timber. If, as I have determined above, the highest and best use of the interior of the island is for recreational purposes, then care must be taken to insure that the recreational value of the interior is not destroyed by overlogging.

██ The commission took its 40 percent figure from testimony regarding the amount of merchantable timber not removed from Beaver Island. The record indicates that 4.7 million board feet were purchased from a total of 7.8 million board feet of standing timber (60%). All of the purchased timber was in veneer trees. Defendants' expert testified that aesthetic concerns were involved in the Beaver Island harvest, although he did not directly state that aesthetic considerations were responsible for the whole 40 percent reduction. It cannot be said, however, that the commission was clearly erroneous in relying on the Beaver Island sale for the 40 percent figure.

The commission was also not clearly erroneous in applying a 12 percent annual discount rate to standing timber which would be harvested over a 6-year period. One of the more misunderstood concepts in this action has been discounting. Essentially, discounting is based on the theory that money or other value which will not be received until some future date is worth less than the same amount received at the present. Several variables affect how much less that value is worth.

██ For purposes of timber analysis, relevant factors include the time value of money, risk, nonliquidity, growth in volume of standing timber, and predictable growth in value. Inflation is not a relevant factor. Under certain circumstances inflation may be a factor; but it is a cardinal rule that where economic analyses are done in constant dollars, as they were here, inflation should not be a factor in discounting.

██ The commission relied on plaintiff's expert's testimony that 16 percent was an appropriate discount rate reflecting time value of money, risk, and nonliquidity. From this the commission deducted 4 percent to reflect the 4 percent annual growth in volume of standing timber, resulting in a 12 percent rate. The dissent did not discount future timber harvests at all. The landowners argue strenuously that no discounting should occur, relying on Dr. Gunter's (plaintiff's expert) statement that the value of standing timber increases at a rate of 3 percent per year over inflation. Assuming the statement is correct, the landowners' analysis is not, because it ignores the other components of discounting. Even Dr. Gunter suggested that standing timber should still be discounted at 9 percent after the 3 percent increase in value was taken into consideration. Thus landowners are incorrect in arguing that no discounting should occur.

The commission did not take into account the historic 3 percent annual increase in value of standing timber testified to by Dr. Gunter. There was also before the commission, however, evidence suggesting that for hardwoods, in north-central United States, there would be no real increase in value during the period 1976–1990. Therefore, the commission was certainly free to ignore the 3 percent factor. Accordingly, the 12 percent rate was properly applied by the commission.

██ The third major timber issue involves stumpage prices. In this area the commission has erred. The commission set a stumpage price of $85.44 per thousand board feet (mbf). This was based on the stumpage price paid on Beaver Island (set at $37.44/mbf by the government's expert and $35.74/mbf by landowners' expert) plus a cost differential of $48.00/mbf. This cost differential arises because North Manitou is significantly closer to the mainland, has a protected water route to the mainland, and has denser timber stands, thus reducing cutting and skidding costs. The purchaser of timber is willing to pay to the seller a stumpage price which is increased by the amount which harvesting costs decrease. This is inherent in the definition of stumpage price as used throughout this action: value of the logs at the mill, less costs of purchasing the standing timber and getting the logs to the mill. Assuming the mill value remains constant, lower harvesting and transportation costs result in higher purchase prices. Therefore landowners here are entitled to the $48/mbf differential.

This analysis, however, assumes that North Manitou timber is equal in quality to that on Beaver Island. Both timber ex-

perts, the commission majority and the dissent all agree that the timber on North Manitou is superior to that on Beaver. This higher quality is not reflected in the stumpage price set by the commission. Accordingly the stumpage price determined by the commission is clearly erroneous.

After careful review of all the timber testimony and evidence, I find that a stumpage price of $106.75/mbf as suggested by the landowners is appropriate ($6,140,700 ÷ 57,526,728 board feet). The landowners' price analysis is well-documented. The $106.75/mbf figure is based on costs involved for clearcutting. Since recreational development, requiring selective cutting, is the basis of my decision, the $106.75/mbf figure is too high. Both experts agreed that it is more expensive to log selectively than to clear cut. Accordingly, the timber purchaser will pay a lower price for the timber, reflecting these higher costs.

Landowners' expert stated that it would cost $112.50/mbf to clear cut the island. The government's expert stated costs of $125–150/mbf to log selectively. These cost estimates seem to be in reasonable agreement. Because a timber harvester would quite likely leave behind as part of the 40 percent nonharvest, those trees which are most expensive to remove, I find the lower end of the cost range for selective cutting to be most appropriate. Using the $125/mbf figure for selective cutting, costs will increase $12.50/mbf over clear cutting ($125/mbf—$112.50/mbf), and the price which landowners will receive will drop accordingly, by $12.50/mbf. Accordingly, I find that the appropriate stumpage price is $94.25/mbf ($106.75/mbf—$12.50/mbf).

I have reviewed the numerous other issues regarding timber raised by the defendants and find none of them establish clear error on the part of the commission.

Summarizing, I find the following facts as determined by the commission are not clearly erroneous: the island holds 57,526,728 board feet of merchantable timber; of this, 60 percent can be removed without adverse aesthetic and economic impacts on the residual; the timber can be removed over a period of six years; and the future harvest should be discounted at an annual rate of 12 percent. I further find that the proper stumpage price is $94.25/mbf. These facts establish a contributory value for the timber on North Manitou Island of $2,228,940.

| | |
|---|---|
| Merchantable timber | 57,526,728 bf |
| | × .60 |
| Removable timber | 34,516,036 bf |
| | × $94.25 |
| Stumpage price | /mbf |
| Total value of timber | $3,253,136 |
| | ÷ 6 |
| Value of timber removed in each of six years | $542,189 |
| Discount factor (6 years, 12 percent) | × 4.111 |
| Contributing value of timber | $2,228,940 |

CONCLUSION

In conclusion I find that the commission report is clearly erroneous in two respects: (1) it fails to properly value the quality of timber on the subject parcel, and (2) it excessively and erroneously discounts frontage values based on the size of the island. In all other respects I find the report appropriate. After correcting the two errors noted above, I find just compensation for the subject parcel is $11,066,000, determined as follows:

| | |
|---|---|
| Contributory value of timber | $2,228,940 |
| Contributory value of frontage | 6,570,000 |
| Contributory value of the interior | 2,016,600 |
| Stipulated value of improvements | 249,990 |
| Total | $11,065,530 |
| JUST COMPENSATION | $11,066,000 |